Submitted on remand November 18, 1998; resubmitted en banc January 13, reversed in part; otherwise affirmed May 31, 2000

## STATE OF OREGON,
*Respondent,*

*v.*

## JOHN HOWARD MAYNARD,
*Appellant.*

## (CC 10-92-06551; CA A81182)

5 P3d 1142

Robert Cole Tozer for appellant.

Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Kaye E. Sunderland, Assistant Attorney General, for respondent.

Before Deits, Chief Judge, Edmonds, De Muniz, Landau, Haselton, Armstrong, Wollheim, and Brewer, Judges.

BREWER, J.

Haselton, J., concurring.

Armstrong, J., concurring.

Edmonds, J., dissenting.

Landau, J., dissenting.

**BREWER, J.**

In *State v. Maynard*, 138 Or App 647, 910 P2d 1115 (1996), this court held that the prohibition of ORS 167.065(1)(a)[1] against furnishing materials to minors that depict "sexual conduct" or "sexual excitement" violated Article I, section 8, of the Oregon Constitution.[2] The Supreme Court has since vacated that decision and remanded the case for our reconsideration in light of its decision in *State v. Stoneman*, 323 Or 536, 920 P2d 535 (1996).[3] For the reasons that follow, we hold that we erred in our former conclusion that ORS 167.065(1)(a) does not focus on preventing harmful effects that the legislature may constitutionally proscribe. Nevertheless, we adhere to our ultimate holding because the statute is unconstitutionally overbroad.[4]

We begin our analysis with consideration of the Supreme Court's decision in *Stoneman*. The defendant there was indicted for purchasing a magazine and a video containing visual reproductions of children engaged in sexually explicit conduct, in violation of ORS 163.680 (1987).[5] The

---

[1] ORS 167.065 provides, in part:

"(1) A person commits the crime of furnishing obscene materials to minors if, knowing or having good reason to know the character of the material furnished, the person furnishes to a minor:

"(a) Any picture, photograph, drawing, sculpture, motion picture, film or other visual representation or image of a person or portion of the human body that depicts nudity, sadomachistic abuse, sexual conduct or sexual excitement[.]"

[2] Article I, section 8, provides, in part:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for abuse of this right."

[3] *State v. Maynard*, 327 Or 582, 964 P2d 264 (1998).

[4] In addition to his conviction on three counts of furnishing obscene materials to minors, defendant also was convicted on three counts of endangering the welfare of minors. ORS 163.575(1)(a). On appeal, defendant has not challenged the "endangering" convictions. *Maynard*, 138 Or App at 649.

[5] ORS 163.680 (1987) provided:

"(1) It is unlawful for any person to pay or give anything of value to observe sexually explicit conduct by a child known by the person to be under 18 years of age, or to pay or give anything of value to obtain or view a photograph, motion picture, video tape or other visual reproduction of sexually explicit conduct by a child under 18 years of age.

"(2) Violation of subsection (1) of this section is a Class C felony."

trial court sustained the defendant's demurrer to the charge and held that the statute violated Article I, section 8. This court affirmed on appeal,[6] and the Supreme Court reversed on review.

The court first rejected the state's contention that it should modify its traditional approach by balancing the public interest in protecting children from harm against the burden on freedom of expression imposed by the statute:

"We reject the state's suggestion that we abandon the rule that the court traditionally has employed in resolving Article I, section 8, issues, in recognition of the particular importance of the legislative objective at issue here." 323 Or at 542-43.

The court then began its analysis under Article I, section 8. *See generally State v. Robertson*, 293 Or 402, 649 P2d 569 (1982); *State v. Plowman*, 314 Or 157, 838 P2d 558 (1992), *cert den* 508 US 974 (1993). It held that the statute described and prohibited commerce in certain forms of communication. The court next concluded that the prohibition against purchasing visual reproductions of children engaged in sexually explicit conduct could not be justified as a historical exception to the prohibition of Article I, section 8, pursuant to Statutes of Oregon 1854, chapter XI, section 10, pp 210-11.[7] In its next step, the Supreme Court parted with our analysis in *Stoneman*, a departure with significant implications for this case. The court concluded that ORS 163.680 (1987) was concerned with harm to children. *Stoneman*, 323 Or at 545. In doing so, the court said that "[t]he Court of Appeals' majority was wrong in holding to the contrary merely because the statute did not describe the communication, the commerce in which is forbidden, specifically in terms of harmful effects." *Id.*

Critical to the Supreme Court's decision was the view that the context of the statute, in addition to its text, informs an understanding of the policy underlying the statute. *Id.* at 546. Relying on the taxonomy established in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859

---

[6] *State v. Stoneman*, 132 Or App 137, 888 P2d 39 (1994).

[7] For reasons explained hereafter in our response to the dissent, we defer for the time being our discussion of the historical exception doctrine.

P2d 1143 (1993), the court examined other statutory provisions relating to ORS 163.680, including a defense under which the purchase of an otherwise prohibited reproduction was legal "so long as that reproduction is not the product of an act of actual sexual abuse of a child." *Stoneman*, 323 at 547. The court then concluded that the subject statute, as well as the entire part of the criminal code in which it was located, "was aimed at preventing and punishing conduct— the subjection of [minors] to sexual exploitation for the purposes of visual recording." *Id*. at 548. Because the communication prohibited a "continuation and an integral part of the underlying harmful acts," the statute was not invalid on its face, given that the legislature is authorized to regulate commerce in communication derived from the sexual exploitation of children. *Id*. at 548-49.

Finally, the court upheld the statute against an overbreadth challenge, interpreting it as "narrowly tailored to reach only forbidden effects [*i.e*., commerce that is a direct fruit of child abuse] and [that it] did not extend to privileged expression." *Id*. at 550. With the foregoing in mind, we assess the impact of *Stoneman* on the constitutional challenge to ORS 167.065(1)(a).

Defendant in this case was convicted of furnishing obscene materials to minors. ORS 167.065(1)(a). In our earlier decision, we stated that the issue on appeal was whether the statutory prohibition against furnishing materials to minors that depict "sexual conduct"[8] or "sexual excitement"[9] violated Article I, section 8.[10] *Maynard*, 138 Or App at 652.

---

[8] ORS 167.060(10) contains the definition of "sexual conduct":

" 'Sexual conduct' means human masturbation, sexual intercourse, or any touching of the genitals, pubic areas or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification."

We considered only the "human masturbation" and "sexual intercourse" portions of the definition of "sexual conduct" because we had previously held the rest of that definition unconstitutionally overbroad. *Maynard*, 138 Or App at 652 (citing *State v. House*, 66 Or App 953, 676 P2d 892, *mod* 68 Or App 360, 681 P2d 173 (1984), *aff'd on other grounds* 299 Or 78, 698 P2d 951 (1985)).

[9] ORS 167.060(11) contains the definition of "sexual excitement":

" 'Sexual excitement' means the condition of human male or female genitals or the breasts of the female when in a state of sexual stimulation, or the sensual experiences of humans engaging in or witnessing sexual conduct or nudity."

[10] We severed the proscription against depictions of "nudity" because it had previously been held to be unconstitutionally overbroad. *Id*. at 652. We did not

We next determined that materials depicting sexual conduct or sexual excitement are expression encompassed by Article I, section 8. That determination is consistent with *Stoneman* and other relevant Supreme Court decisions. *See State v. Henry*, 302 Or 510, 515, 732 P2d 9 (1987).

We next addressed whether the statute was directed at harmful effects resulting from the exposure of children to sexually explicit materials or, alternatively, whether it was directed to the content of an opinion or communication. *Maynard*, 138 Or App at 652-54. We relied on our examination of the *text* of the statute and found that it neither expressly nor by clear implication identified the effects to be avoided. Therefore, we concluded that the statute was "directed solely at prohibiting certain communication with minors." *Id.* at 654. We did not examine related statutory provisions for context in order to ascertain any effect forbidden by the statute. In light of *Stoneman*, our analysis was therefore incomplete. We now examine the context of the statute to determine whether it sufficiently identified the harmful effects it sought to prevent.

■ A statute's context includes related statutory provisions. *PGE*, 317 Or at 611. ORS 167.065(1) is part of a broader statutory framework that addresses the protection of children from exposure to obscene material. ORS 167.065 to ORS 167.085.[11] That framework includes ORS 167.085, which creates affirmative defenses to alleged violations of ORS 167.065(1)(a). It provides:

"In any prosecution under ORS 167.065 to [ORS] 167.080, it is an affirmative defense for the defendant to prove:

"(1) That the defendant was in a parental or guardianship relationship with the minor;

"(2) That the defendant was a bona fide school, museum or public library, or was acting in the course of employment as an employee of such organization or of a

decide whether the prohibition of ORS 167.065(1)(a) against furnishing materials to minors that depict sadomachistic abuse violates Article I, section 8.

[11] ORS 167.070 prohibits sending obscene materials to minors; ORS 167.075 proscribes exhibiting an obscene performance to a minor; and ORS 167.080 criminalizes displaying obscene materials to minors.

retail outlet affiliated with and serving the educational purpose of such organization;

"(3)  That the defendant was charged with the sale, showing, exhibition or display of an item, those portions of which might otherwise be contraband forming merely an incidental part of an otherwise nonoffending whole, and serving some legitimate purpose therein other than titillation;

"(4)  That the defendant had reasonable cause to believe that the person involved was not a minor."

ORS 167.085(1) and (2) exempt various categories of persons and organizations from the reach of ORS 167.065. Taking those exemptions into account, ORS 167.065 is directed exclusively at persons and organizations other than parents, guardians, schools, museums, libraries, and employees of the last three named organizations. The population of potential offenders is reduced further by two additional exemptions. First, the defendant may establish that he or she reasonably believed that the target of the material was not a minor. ORS 167.085(4). Second, and more germane to this case, it is a complete defense that the materials form merely an "incidental part of an otherwise nonoffending whole" and serve a purpose other than titillation. ORS 167.085(3).

The word "titillation" was not defined by the legislature in ORS 167.085 or any related statute. In analyzing the text of the statute for definition, words of common usage are given their plain, natural and ordinary meanings. *PGE*, 317 Or at 611. "Titillate" is defined in *Webster's Third New Int'l Dictionary*, 2400 (unabridged ed 1993) to mean "to excite pleasurably or agreeably: arouse by stimulation." In the context of ORS 167.065(1)(a), which refers to depictions of sexual conduct and sexual excitement, titillation logically refers to sexual excitement or arousal. Although the defense provided by ORS 167.085(3) does not expressly state that the person to be protected from titillation is the victim of the offense, that motive is obvious from the overall framework of ORS 167.065 to ORS 167.085. The victim of each offense in that group of statutes must be a minor. In light of that common theme, it would make no sense to shield a defendant from criminal liability merely because that defendant did not primarily intend

to titillate him or herself by engaging in the prohibited conduct. Thus, the context of ORS 167.085(3) plainly shows that the defense applies to those materials not primarily intended to titillate the victim. We further note that ORS 167.085(3) looks to the purpose of the materials and does not ask whether that purpose was accomplished. Thus, if the defendant *attempts* to titillate a minor by proscribed means, then the defense does not apply, regardless of whether the attempt succeeds.

*Stoneman* is not the first Supreme Court decision to remind us that we may look beyond the express language of a statute to ascertain the harmful effects that the legislature sought to prevent through its enactment. *See, e.g., Moser v. Frohnmayer*, 315 Or 372, 379, 845 P2d 1284 (1993); *Plowman*, 314 Or at 165-66. We echo the view of Judge De Muniz in his dissent from our first decision in this case:

> "ORS 167.065(1)(a) makes no explicit reference to what effects it seeks to prevent. However, the state contends that the statute is 'aimed at protecting children from the harmful effects of viewing hardcore pornography.' I can conceive of no other purpose, and have no difficulty inferring that was the legislature's purpose." *Maynard*, 138 Or App at 687.

Therefore, in context with ORS 167.085, we conclude that ORS 167.065(1)(a) *does* focus on effects deemed harmful by the legislature.

Our conclusion contrasts with Judge Armstrong's concurring analysis in our first decision in this case. *Id.* at 661-62. Judge Armstrong concluded that the statute does not focus on harm to children, because

> "it does not apply to parents and guardians who furnish obscene materials to minors for the purpose of harming or endangering their welfare, because those people enjoy a blanket exemption from the statute. * * *
>
>     "* * * * *
>
> "If the material were inherently harmful, the law would not allow the exceptions to its coverage that it does." *Id.*

We acknowledge the irony that parents, guardians, and even museum employees who may prey on children by furnishing

them with obscene materials are protected from conviction under ORS 167.085(1) and (2), whereas another person might not be shielded under any of the statutory defenses, irrespective of motive. We also recognize that in *Stoneman*, the court emphasized that the statute under review "prohibited commerce in material, the production of which *necessarily* involves harm to children." 323 Or at 546 (emphasis in original). However, the "necessity" implicated is that harm must either result from the expression itself[12] or, alternatively, as in *Stoneman*, must inhere in the conduct that created the expression. *Id. Stoneman* does not hold that it is necessary for all such harm to be reached.

The fact that the legislature failed to reach all potential culprits does not mean that it believed attempted titillation of minors by means of obscene materials is not necessarily harmful. In fact, the contrary is evident. There is no plausible explanation for the creation of a defense such as is provided in ORS 167.085(3) for *any* class of defendants unless the legislature deemed such titillation to be harmful to minors. A search for focus on harmful effects should not demand perfect abolition of the harm. Otherwise, we risk overlooking what the legislature plainly did seek to accomplish.

■ We also disagree with the narrow reading that Judge Armstrong gives to the holding in *Stoneman* in his concurrence on remand. The concurrence asserts that "the problem [with the statute] is that *the prohibition* is written in terms of the content of the material rather than the purpose for which it is furnished." 168 Or App at 152 (emphasis added) (Armstrong, J., concurring). However, the concurrence does not take into account *Stoneman*'s lesson that a search for forbidden effects extends to the context of the statute creating a crime and is not confined to an examination of the elements of the offense. 323 Or at 547-48. That context may include any relevant defenses to the crime that are found in related statues. *Id.* We have followed that holding in

---

[12] *See, e.g., Robertson*, 293 Or at 416-17 (coercion statute focused on a forbidden effect—the effect of frightening another person into a nonobligatory and undesired course of conduct).

concluding that the defense found in ORS 167.085(3) identifies the legislature's focus on lawfully forbidden effects.[13] Although the legislature's purpose in enacting ORS 167.065(1)(a) may have been inartfully expressed, it is not obscure. That purpose is to protect children from the effects of hardcore pornography. In light of *Stoneman*, our prior holding to the contrary, based on an examination of the text of ORS 167.065 alone, was not correct. As a consequence, we must complete the Article I, section 8, analysis foreshortened in our first decision.

■■ Following the order of analysis in *Robertson*, we next turn to the question whether the forbidden harm is such that the legislature may restrict expression in confronting it. *State v. Moyle*, 299 Or 691, 699-702, 705 P2d 740 (1985). The legislature's power to identify and proscribe effects that it considers harmful is plenary, subject to constitutional limitations. *Id.* at 699. *Stoneman* confirmed that the legislature is empowered to restrict expression in order to prevent harm to children and, in that case, the court concluded that ORS 167.680 (1987) was so focused. 323 Or at 549. The court held that the prohibited material could not be produced without harming children by subjecting them to the crime of sexual abuse. *Id.* It was not the criminality of the sexual abuse but, rather, the fact that the forbidden communication necessarily involved harm to children that was decisive. *Id.* at 547 n 15. In this case, the challenged statute seeks to prevent harm to children by prohibiting attempts to titillate them by means of sexually explicit materials. The prohibition is directed at effects that the legislature has determined are necessarily harmful to children. In light of *Stoneman*, the legislature may restrict expression in order to prevent such effects.

■■ We next consider whether the statute reaches communication that cannot be excluded from its scope by a permissible narrowing interpretation—*i.e.*, whether it is overbroad. *Moyle*, 299 Or at 701-02; *Robertson*, 293 Or at 418. A

---

[13] We ultimately agree with the concurrence that the statute is constitutionally flawed but only because, as explained below, the defense provided by ORS 167.085(3) does not adequately exempt from criminal responsibility those persons whose intent is not to titillate minors.

claim of overbreadth asserts that the terms of a law reach conduct protected by constitutional guarantees, including the freedoms to speak and write embodied in Article I, section 8. *Id*. at 410. "A legislature can make a law as 'broad' and inclusive as it chooses unless it reaches into constitutionally protected ground. The clearer an 'overbroad' statute is, the harder it is to confine it by interpretation within its constitutionally permissible reach." *Id*. (citing *State v. Blocker*, 291 Or 255, 261, 630 P2d 824 (1981)). The court in *Stoneman* found little difficulty in concluding that ORS 163.680 (1987) survived an overbreadth challenge. The court interpreted the statute to apply only when children are actually engaged in sexually explicit conduct. Therefore, it concluded that the statute reached only materials whose production actually harmed children. Here, the analysis is not so straightforward, and it is constrained by prior decisions of this court that have governed the interpretation of ORS 167.065 and ORS 167.085(3) for many years.

We begin with the observation that laws such as ORS 167.065(1)(a), which focus on forbidden effects, must be further subdivided in an analysis under Article I, section 8. Statutes that are expressed only in terms of forbidden effects and that do not refer to expression at all are nevertheless subject to case-by-case review for potentially unconstitutional application to expression. *Robertson*, 293 Or at 417; *Plowman*, 314 Or at 164. On the other hand, where, as here, a statute expressly prohibits expression used to accomplish forbidden effects, it must be analyzed for overbreadth. The distinction is meaningful because Oregon's constitutional jurisprudence prohibits the narrowing of a statute that restricts expression used to achieve forbidden results through the judicial substitution of a wider set of exclusions from its scope for the set chosen by the legislature. *Robertson*, 293 Or at 436. The rationale for that prohibition lies in the very wording of Article I, section 8, which forbids the enactment of legislation that may only be salvaged through such judicial construction. *Id*. We do not understand *Stoneman* either to address that precept or to alter its importance.[14]

---

[11] Despite *Robertson's* admonition against judicial rewriting of penal legislation to broaden exclusions through the process of construction, the courts have sometimes narrowed a statute's scope through implied limitations. For example, in

In *State v. Frink*, 60 Or App 209, 653 P2d 553 (1982), we held that the portion of ORS 167.065(1)(a) that proscribed the furnishing of materials that depict nudity was unconstitutionally overbroad because it prohibited all depictions of nudity regardless of erotic content. We rejected the state's argument that the statute could be saved by construing the prohibition in conjunction with the defense under ORS 167.085(3), because the defense applies only to the "sale, showing, exhibition or display of materials" while the crime of "furnishing" includes giving, renting, loaning, and otherwise providing material.

In rejecting the state's argument under ORS 167.085, we concluded in *Frink* that

> "[t]o do as the state argues would clearly require a 'construction' of the specific language of ORS 167.085(3) to include giving, renting, loaning or otherwise providing—all forms of furnishing.
>
> "In other words, we would be required to broaden the defense in order to narrow the proscription. To do that, we would be inviting legislation proscribing free expression, leaving it to the courts to protect that freedom in individual cases. We may not do that. *State v. Spencer*, 289 Or 225, 611 P2d 1147 (1980); [*Robertson*]." 60 Or App at 215-16. (Footnote omitted.)

We reasoned in *Frink* that "the scope of the statute may not be narrowed by construction, because the free expression guarantee invoked by the defendant forbade the enactment of the statute." *Id.* at 214. We relied on *Robertson* and quoted several passages from that decision, including the following:

> " 'As the quotation from [*Spencer*] states, it is a prohibition expressly directed at lawmakers at the time of considering a proposed law and forbidding passage of any law that in terms restrains the "free expression of opinion" or restricts "the right to speak, write, or print freely on any subject whatever." It does not invite the enactment of such laws, leaving it to courts to protect freedom of expression in

*Moyle*, the court upheld the harassment statute, ORS 166.065(1)(d), because it was able to imply that the threat of harm required for conviction must be "genuine." The court thereby excluded pranks and angry but empty threats from its reach. For reasons explained below, the approach taken in *Moyle* is not applicable in this case.

individual cases. *See* 289 Or at 228.' 293 Or at 413 n 10." *Id.* at 215.

We reaffirmed the reasoning of *Frink* in *State v. Woodcock*, 75 Or App 659, 706 P2d 1012 (1985), *rev den* 300 Or 506 (1986). There, the defendant sold lapel buttons to minors containing slogans that were obscene. Once more, the state relied on ORS 167.085, this time to meet an overbreadth challenge to ORS 167.065(1)(b), which prohibited furnishing to minors "[a]ny book, magazine, paperback, pamphlet or other written or printed matter * * * which contains * * * obscenities." We held:

> "Our reasoning in *Frink* applies here. Because ORS 167.065(1)(b) applies to the giving, renting, loaning or otherwise providing materials containing 'obscenities,' regardless of the significance of the words in the context of the work taken as a whole, the statute is unconstitutionally overbroad under the Oregon Constitution." *Woodcock*, 75 Or App at 662-63.[15]

The reasoning of *Frink* and *Woodcock* controls the overbreadth analysis in this case as well. Whether we approve or not, minors are regularly exposed to visual images, including television programs, movies, and videos that depict sexual conduct and sexual excitement in various levels of detail. Because ORS 167.065(1)(a) applies, regardless of the significance of such depictions in the context of the materials taken as a whole, it is overbroad. The state nonetheless renews the argument it made in *Frink* and *Woodcock* that the statute can be salvaged by interpreting its prohibition in concert with the defense provided by ORS 167.085(3). We reject that argument yet again. In doing so, we recognize that *Frink* and *Woodcock* were decided before the Supreme Court announced its methodology for statutory interpretation in *PGE*. In *Stoneman*, the court applied that methodology to define the word "simulation" so narrowly as to uphold the statute reviewed there. 323 Or at 540. However, in order

---

[15] Judge Van Hoomissen's dissent in *Woodcock* criticized *Frink* for ignoring a legislative oversight in drafting that caused the defense in ORS 167.085(3) to apply to a narrower band of communication than does the offense itself. *Id.* at 663-64. Despite the holdings in *Frink* and *Woodcock*, neither ORS 167.065(1) nor ORS 167.085(3) has since been amended by the legislature to unify the scope of proscription and defense. Hence, we return to plowed ground.

similarly to save ORS 167.065(1)(a), it would be necessary to interpret the words "display," "showing," and "exhibition," as employed in the defense, to encompass the full meaning of the verb "furnish" as the latter was explicitly defined by the legislature.

ORS 167.060(3) provides that " '[furnish]' means to sell, give, rent, loan or otherwise provide." None of the words used to define "furnish" was further defined by the legislature. Because none of those words is apparently used in a technical sense, we apply their plain and ordinary meanings. *PGE*, 317 Or at 611. Viewed accordingly, the word "give" means "to confer the ownership of receiving giving a return." *Webster's Third New Int'l Dictionary* at 959. The word "rent" means "to take and hold under an agreement to pay rent." *Id.* at 1923. "Loan" means "to lend," which in turn means "to give into another's keeping for temporary use on condition that the borrower return the same or its equivalent." *Id.* at 1293, 1326. The relevant ordinary meaning of "provide" is "to supply for use." *Id.* at 1827.

The state attempts to demonstrate equivalence in the statutory terminology by focusing on the meaning of the word "showing," as used in ORS 167.085(3). "Showing" also was not defined by the legislature. The ordinary meaning of the verb "show" includes "to cause or permit to be seen," and "to offer for inspection." *Id.* at 2105. The state contends that "[b]ecause one necessarily 'shows' an item to another when he sells, gives, rents, loans or otherwise provides it to that person, the affirmative defense in [ORS 167.085(3)] is invariably available on a charge of 'furnishing' obscene materials to a minor." We disagree.

That argument falters because the statutory meaning of "furnish" includes acts of transfer and distribution such as "giving," "renting," and "loaning." In contrast, the words "display," "showing," and "exhibition" ordinarily convey the act of presenting something for view. "Displays publicly" is defined in ORS 167.060(2) to mean "exposing, placing, posting, exhibiting, or in any way displaying * * *." "Exhibit," on the other hand, is not defined in the obscenity statutes. The plain and ordinary meaning of "exhibit" is "to present to view." *Id.* at 796.

The accepted meanings of each of the words used in the defense fall short of many illustrations of "furnishing." For example, while the defense might apply to a movie theater's *showing* of an R-rated movie, it would not apply to a video store *rental* of the same movie to a 17-year-old. Similarly, the *showing* of a music video depicting sexual conduct or excitement to a minor might not be prohibited, while *giving* a copy of the same video to a minor, regardless of purpose, would be a crime because the qualified defense does not apply. Such contrasting examples demonstrate that there is a significant body of expression covered by the prohibition that is not captured by the plain, natural, and ordinary meaning of the word "showing." We do not understand *PGE* to authorize the linguistic transformation required to bridge that gap in meaning. Accordingly, the defense provided by ORS 167.085(3) does not, under any reasonable construction of its text, coincide with the full range of expression prohibited by ORS 167.065(1)(a).

It is true that both text and context must be examined at the first level of analysis under *PGE*. The state observes that ORS 167.085 expressly applies to a body of offenses that includes both "furnishing" and "sending," as well as "exhibiting" and "displaying," obscenities to children. For example, ORS 167.070 forbids "sending" obscene materials to minors. "Sending," as does "furnishing," signifies an act of distribution. We are not persuaded by the state's argument. Those examples merely confirm the existence of the discrepancy identified in *Frink* and *Woodcock*; they neither harmonize nor erase it.

It may well be, as suggested by the dissent in *Woodcock*, that the legislature simply made one or more mistakes in drafting or compiling the relevant statutes in various stages of development. However, we do not examine legislative history under *PGE* unless we are unable to determine the meaning of the statutes through examination of their text and context. *Fidanque v. Oregon Govt. Standards and Practices*, 328 Or 1, 9, 969 P2d 376 (1998). Moreover, even assuming that the legislature made such a mistake, the courts are not free to expunge it in the guise of statutory interpretation. ORS 174.010.

Unlike *Moyle*, this case does not present an opportunity for the courts to imply a limitation that may not have occurred to the legislature but that is consistent with its *expressed* intent. Also, unlike *Stoneman*, this case does not turn on a choice between statutory meanings that may save a statute from overbreadth. Ultimately, the problem with ORS 167.065(1)(a) remains unchanged since *Frink*. In light of *Stoneman*, the statute forbids harmful effects by means of expression. Therefore, it is not facially invalid under Article I, section 8. However, the statute does prohibit expression that is protected, and it may not be narrowed through judicial interpretation to remedy that defect. Therefore, we hold that ORS 167.065(1) "impermissibly restricts the right to speak, write, or print freely on any subject whatever under Article I, section 8, of the Oregon Constitution. It is unconstitutional." *Fidanque*, 328 Or at 9.[16]

We now turn to our disagreement with Judge Landau's dissent. We have left our discussion of the dissent to the end because, as we will explain, the dissent's analysis reaches an issue that, when properly viewed, has no place in the decision of this case.

After we concluded in our original opinion that ORS 167.065(1)(a) focused on the content of expression, we next considered whether the statute proscribed expression under a historical exception to the guarantee of Article I, section 8. *Maynard*, 138 Or App at 654. As did the court in *Stoneman* with respect to ORS 163.680, we rejected the state's assertion that ORS 167.065(1)(a) represented a contemporary version of an exception established by Oregon territorial legislation. *Id.* Statutes of Oregon 1854, ch XI, section 10, pp 210-11, was the basis for the exception asserted by the state in *Stoneman* and is the primary source of the state's reliance here as well.[17]

---

[16] In his brief on the merits on review in the Supreme Court, defendant contends that ORS 167.065(1)(a) is unconstitutionally vague. That argument was not raised in this court or in the trial court. Because we decide this case on overbreadth grounds, it is not necessary for us to reach the issue of vagueness. However, it appears likely that the claim is unpreserved. *State v. Castrejon*, 317 Or 202, 856 P2d 616 (1993). Finally, because this case is resolved under the Oregon Constitution, it is not necessary to consider defendant's First Amendment challenge.

[17] The territorial statute provided:

We concluded that, because the territorial statute did not define "obscene," its terms were "too undefined to conclude that ORS 167.065(1)(a) falls within its scope." *Maynard,* 138 Or App at 654. In *Stoneman,* the state likewise asserted that the territorial statute reflected a historical exception to Article I, section 8, within which ORS 163.680(1987) "wholly" fell. The Supreme Court disagreed and stated:

> "That territorial [statute] was directed at persons who 'import, print, publish, sell or distribute [matter] containing obscene language or obscene prints * * * manifestly tending to the corruption of the morals of youth.' But, as this court noted in *Henry,* that territorial statute 'contained no definition of "obscene" and * * * was directed primarily to the protection of youth.' 302 Or at 522. Consequently, this court concluded in *Henry* that *the territorial statute provided no support for any 'well-established historical exception to freedom of expression.' Id.* We agree with the Court of Appeals['] majority that, without more, that territorial statute did not sufficiently and clearly establish an historical exception within which the statute under review * * * could be said 'wholly' to fall." *Stoneman,* 323 Or at 545 (emphasis added).

In our view, the court in *Stoneman* adhered to the conclusion that the territorial statute provided "no support for *any* 'well-established historical exception,' " not merely an exception relating to the statute under review. *Id.* (emphasis added). The dissent, however, correctly observes that the court mentioned, in *dictum* contained in a footnote, the possibility that the protection of children, in general, may constitute a historical exception to the Article I, section 8, guarantee of free expression.[18]

---

"If any person shall import, print, publish, sell or distribute any book or any pamphlet, ballad, printed paper or other thing containing obscene language or obscene prints, pictures, figures, or other descriptions, manifestly tending to the corruption of the morals of youth, or shall introduce into any family, school or place of education, or shall buy, procure, receive, or have in his possession, any such book, pamphlet, ballad, printed paper or other thing, either for the purpose of loan, sale, exhibition or circulation, or with intent to introduce the same into any family, school, or place of education, he shall, on conviction, be punished by imprisonment in the county jail not more than six, nor less than three months, or by a fine not more than three hundred, nor less than fifty dollars."

[18] In that footnote, the Supreme Court stated that "[n]othing in this opinion * * * should be construed to reflect on the continuing vitality of the implication in

Based on that *dictum*, the dissent conducts an exhaustive search of history and an elaborate analysis of the historical exception doctrine, ultimately concluding that the framers of the Oregon Constitution intended such an exception for regulation of the distribution of obscene materials to minors and that ORS 167.065(1)(a) wholly falls within that exception. Although we sympathize with the spirit of the dissent's expedition, because it raises fair questions about how the historical exception doctrine works and proposes insightful answers to a number of those questions, we believe that the mission is fatally misguided in origin, procedure, and substance.

We begin with the roots of the dissent's undertaking. This case was remanded to us "in light of" *Stoneman*. By its single line mandate, we infer that the Supreme Court meant to direct us to the *holding* of *Stoneman*, which follows its analysis of the difference between laws that focus on the content, as opposed to those that focus on the effects, of obscenity involving children. The dissent disagrees, apparently assuming that we were directed, instead, to *dictum*, that, if the dissent has its way, bypasses the heart of *Stoneman's* analysis altogether. Although we agree, in general, with the dissent's implicit premise that the law should be correctly announced and applied on remand, we do not believe that the dissent has addressed the problem that we have been instructed to consider. Nonetheless, because of the importance of the issues the dissent raises, we are compelled to respond.

We take issue with the procedural order of inquiry followed by the dissent. The dissent's historical exception analysis precedes and, given the conclusion it reaches, obviates any need for determining whether the statute focuses on the content of expression or on its effects. That methodology is erroneous and the error infects the outcome of the analysis.

██. The regulation of harmful effects achieved through expression does not require a historical exception under the *Robertson* methodology. In *Plowman*, the Supreme Court explained the tiers of that methodology:

---

*Henry* * * * that the protection of children may constitute an historical exception * * *." 323 Or at 543 n 7.

"In [*Robertson*], this court established a framework for evaluating whether a law violates Article I, section 8. First, the court recognized a distinction between laws that focus on the *content* of speech or writing and laws that focus on proscribing the pursuit or accomplishment of *forbidden results.* 293 Or at 416-17. The court reasoned that a law of the former type, a law 'written in terms directed to the substance of any "opinion" or any "subject" of communication,' violates Article I, section 8,

" 'unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach.' *Id.* at 412.

"Laws of the latter type, which focus on forbidden results, can be divided further into two categories. The first category focuses on forbidden effects, but expressly prohibits expression used to achieve those effects. * * * Such laws are analyzed for overbreadth:

" 'When the proscribed means include speech or writing, however, even a law written to focus on a forbidden effect * * * must be scrutinized to determine whether it appears to reach privileged communication or whether it can be interpreted to avoid such "overbreadth." ' *Ibid.*

"The second kind of law also focuses on forbidden effects, but *without referring to expression at all.* Of that category, this court wrote:

" 'If [a] statute [is] directed only against causing the forbidden effects, a person accused of causing such effects by language or gestures would be left to assert (apart from a vagueness claim) that the statute could not constitutionally be applied to his particular words or other expression, not that it was drawn and enacted contrary to Article I, section 8.' *Id.* at 417." *Plowman*, 314 Or at 163-64.

It is clear from *Plowman* that the historical exception analysis applies only to statutes that focus on the content of expression rather than on its effects. The court adhered to that formulation in *City of Eugene v. Miller*, 318 Or 480, 488, 871 P2d 454 (1994) (Laws that focus on content of speech, substance of opinion, or subject of communication

violate Article I, section 8, unless wholly contained within a historical exception. Laws that focus on forbidden effects but prohibit expression used to achieve those effects are analyzed for overbreadth.).

The dissent follows a different method of analysis, which causes it to detour into an unnecessary examination of the historical exception doctrine. The dissent mistakenly undertakes its analysis without first determining whether ORS 167.065(1) focuses on the content of expression or, instead, focuses on the forbidden effects of expression used to achieve those effects. It is likely that the dissent proceeds as it does because of portions of the Supreme Court's analysis in *Stoneman* that, if considered in isolation, might appear to support a departure from the *Robertson* and *Plowman* methodology. In fact, the dissent alludes to that reliance by describing *Stoneman's* analytical process as "slightly different from the one that we applied in our original opinion in this case." 168 Or App at 166 (Landau, J., dissenting).

In *Stoneman*, the court began its analysis in the tradition of *Robertson*.

"We begin that exercise by deciding whether ORS 163.680 (1987) was on its face 'written in terms directed to the substance of any "opinion" or any "subject" of communication.' *Robertson*, 293 Or at 412. A statute that is so written is *invalid on its face*, unless it fits 'wholly' within some 'historical exception.' *Id.*" *Stoneman*, 323 Or at 543 (emphasis added).

The foregoing statement is entirely consistent with the principle that the historical exception analysis is limited to content-focused laws. However, the immediately succeeding paragraph in *Stoneman* begins:

"If the enactment's restraint on speech or communication lies outside an historical exception, then a further inquiry is made—whether the *actual focus* of the enactment is on an *effect* or *harm* that may be proscribed, rather than on the substance of the communication itself." *Id.* at 543 (emphasis in original).

Later in its analysis, before concluding that ORS 163.680 (1987) did, in fact, permissibly focus on effects rather than on

the content of expression, the court conducted a brief examination of the state's historical exception argument and agreed with our decision in *Stoneman* that no such exception was shown to exist.

If the court had said nothing else about its application of the *Robertson/Plowman* methodology, we might agree with the dissent that an implicit shift in that methodology had occurred, requiring analysis of any claimed historical exception *before* we consider whether the challenged law focused on content, rather than on the effects of expression. However, the court did say more, and what it said leads to the conclusion that no change in methodology was intended.

The court also said in *Stoneman*:

"It is true, as the Court of Appeals recognized, that the universe of statutes may be divided initially into two categories—those that focus on the content of speech and those that focus on the effect of speech. But, as the summary of our methodology's four steps indicates, a reviewing court's work is not over when a statute is placed into one or another of those general classifications. Because the statute in question described and prohibited commerce in certain forms of communication, it must be examined under *one or the other of the first two categories identified in Robertson and reiterated in Plowman.*

"*Under the first category, the statute could pass constitutional muster only if the restraint that it imposed falls 'wholly' within some historical exception.*" *Id.* at 544-45 (emphasis added).

The court then proceeded to discuss the historical exception arguments made by the parties along with our analysis of the issue.[19] The court turned next, as we have already said, to the "content vs. effects" portion of its analysis. Significantly, however, the court prefaced that discussion with "*[w]ith respect to this second category,* we think it is clear that ORS 163.680 (1987) was concerned with harm to children." *Id.* at 545 (emphasis added).

---

[19] We analyzed the historical exception issue because we concluded that the statute focused on the content of expression, rather than on its effects. *Stoneman*, 132 Or App at 144.

Thus, it is evident that the court believed, first, that its methodology remained the same as that followed in *Robertson* and *Plowman*; second, that laws challenged under Article I, section 8, must be examined under one *or* the other of the first two categories described in those cases and, third, that the first category of laws identified in those cases—laws that focus on the content of speech—is the category that is subject to the possibility of a historical exception. Any other conclusion assumes that the court meant to modify a key element of the *Robertson/Plowman* test without openly acknowledging such an intention. For at least two additional reasons, that assumption is untenable.

First, such an assumption would impair the logical consistency of the court's decision. As we have observed, the court began its analysis with the well-understood proposition that content-focused laws are facially invalid unless authorized by a historical exception. The court next posited that, if such an exception is not found, we ask whether the focus of the law is on the effects of communication. There is, at the least, a semantic tension between those propositions because the second, depending on how it is understood, seems to reverse the order of inquiry established by the first.

The Supreme Court has identified only two categories of laws involving speech within the meaning of Article I, second 8—those that focus on content and those that focus on effects. If, as the first proposition holds, it is content-focused laws that may be salvaged by historical exceptions, that focus must be ascertained before the search for an exception is necessary or even meaningful. If the law focuses on effects, that focus will, thus, likewise be ascertained *before* a historical exception inquiry is implicated. Therefore, the court's second proposition is difficult to square with the first, unless the second is understood not to address the order of inquiry but, rather, merely to say that laws focusing on the effects of speech are valid even though no historical exception authorizes them. So understood, the court's later discussion of our historical exception analysis in *Stoneman* is *dictum*, and any logical tension within the opinion is resolved.

A different reading of the opinion would violate a principle we have previously followed in order to avoid the

illogical application of analytical methodology. In *Union Oil Co. v. Board of Co. Comm. of Clack. Co.*, 81 Or App 1, 724 P2d 341 (1986), we said:

> "The problem with petitioner's argument is that it takes each of the tests or factors enumerated in [*Clackamas Co. v. Holmes*, 265 Or 193, 508 P2d 190 (1973)], as being wholly independent of the others. Although *Holmes* contains some isolated language which can be read as supporting that view, the opinion (like all other judicial opinions) must be read as a whole and must be read with the understanding that the court intended it to make sense." *Id.* at 6.

*Stoneman* remains faithful to the *Robertson/Plowman* methodology and is also internally consistent if understood as we have urged. If read as the dissent understands it, neither of the foregoing statements is true.

Second, the dissent's reading of *Stoneman's* framework is contradicted by later Supreme Court decisions that address the structure of analysis under Article I, section 8. In *Fidanque*, the court confirmed its adherence to the *Robertson/Plowman* methodology, reaffirming that content-focused laws are subject to historical exception analysis, whereas effects-focused laws are analyzed for overbreadth. 328 Or at 5-6. Likewise, in *State v. Rangel*, 328 Or 294, 977 P2d 379 (1999), the court said:

> "Article I, section 8, forbids the enactment of any statute that is written in terms directed to the restraint of 'free expression of opinion' or the restriction of 'the right to speak, write, or print freely on any subject' of communication, unless the restraint is wholly confined within some historical exception to the free speech guarantees. [*Citing Robertson.*] Article I, section 8, does not prohibit the enactment of statutes which focus on forbidden *effects* of expression, if they are not directed at the substance of expression." *Id.* at 298-99 (emphasis in original).

*Fidanque* and *Rangel*, make clear, as do the cases preceding *Stoneman*, that Article I, section 8, does not subject effects-focused statutes to a historical exception rationale in order to explain and justify their validity. To the contrary, laws focusing on the effects of expression are not *prohibited* by Article I, section 8. Accordingly, the dissent's excursion into the depths of history is premature if it is conducted

before answering the threshold question: Does ORS 167.105 focus on the content of expression, or does it address the forbidden effects of that expression?

Assuming for the sake of argument that the dissent has followed the correct order of inquiry or, alternatively, that ORS 167.065(1)(a) focuses on content instead of the effects of expression, we nonetheless disagree with critical portions of the substance of the dissent's historical exception analysis.

Our first substantive disagreement is with the dissent's conclusion that restraints such as that imposed by ORS 167.065(1)(a) were well established at the time Oregon's Constitution was adopted. The fulcrum of our disagreement is found in the dissent's understanding of the Supreme Court's holding in *Henry*. The dissent argues that *Henry* stands only for the proposition that the 1854 territorial statute did not furnish a historical exception for the statute under review in that case. We disagree and believe that *Henry* governs much of the historical exception analysis in this case. In *Henry*, the Supreme Court, as does the dissent, conducted a historical search for the meaning of the term "obscene." In fact, the court unearthed and discounted many of the historical sources relied on by the dissent, including the colorful anecdote about Sir Charles Sedley's case. 302 Or at 516; 168 Or App at 178.

Although, as the dissent acknowledges, the Supreme Court ultimately rejected the territorial statute as the source of a historical exception for obscenity it did not restrict its review to Oregon antecedents. Before discussing the territorial statute, the court concluded that there was no well-established historical exception for obscenity outside of Oregon either.

"From our review of the English and American cases and statutes, we conclude that restrictions on sexually explicit or obscene expressions were not well established at the time the early freedoms of expression were adopted. * * * The point of our historical review * * * is that while there may long have been a view that 'obscene' materials were improper and not privileged, the pejorative label has not described any single type of impropriety. The term

'obscene' simply functioned as a condemnatory term declaring words, pictures, ideas or conduct as improper by definition, whatever may, from time to time, be placed within the definition, *e.g.,* 'blasphemous,' 'profane,' 'immoral,' 'depraved,' 'corrupt,' 'lewd,' 'lascivious,' 'impure' and 'hardcore pornography.'" *Henry,* 302 Or at 520.

The court's conclusion, contrary to the dissent's suggestion, is a direct holding of the case, because *Robertson* required the court to make precisely the sweeping examination it did in order to complete the historical exception analysis.

The dissent makes a similar foray into the depths of legal history but comes to a very different conclusion. In doing so, the dissent focuses on historical examples of laws predating the adoption of the Oregon Constitution that specifically restricted the distribution of obscene materials to minors. The dissent mentions a couple of illustrations from ancient Greek history, a few early to mid-nineteenth century cases, an English law enacted in 1857, and ten state enactments predating 1859 that prohibited the distribution of obscene materials tending to corrupt the morals of youth. However, the dissent relegates to a footnote its discussion of the Supreme Court's warning in *Henry* that statutes enacted at or near the time Oregon's Constitution was adopted are not necessarily to be given much weight because the drafters were "concerned with broad principles of long-range significance." *Id.* at 521-22. Unlike the dissent, we do not view that statement as cryptic at all. Rather, it is a strong admonition against the statute-counting exercise that is, at least, one cornerstone of the dissent's analysis.

Perhaps recognizing that the evidence it cites is not exactly an overwhelming body of law, the dissent primarily focuses, as did the Supreme Court in *Henry,* on the state of obscenity law as it generally existed in the eighteenth and nineteenth centuries, without regard to restrictions peculiar to minors. The dissent's disagreement with *Henry's* view of that history highlights the perils of its quest, especially in light of the uncertainties in the application of the *Robertson* template that the dissent identifies. Each opinion arrives at

its own assessment of the weight and direction of the historical record of that era in an exercise that is uniquely susceptible to differences in judgment. Although the dissent's examination of the record is more thorough than was the Supreme Court's published discussion in *Henry*, the conclusion it reaches is not necessarily more compelling. More importantly, because the main emphasis of the dissent's historical review is, like the Supreme Court's in *Henry*, on the general state of restraint on obscenity, it is the Supreme Court's view of that evidence, and not the dissent's, that binds us.

After reviewing the historical evidence, the court in *Henry* concluded that the term "obscene" did not describe "any single type of impropriety"; its meaning evolved over time as dictated by the then-existing morals and values of society. *Id.* at 520. In other words, the court concluded that laws restraining the dissemination of obscene materials were in fact restraining the freedom of public disclosure and debate over expression society deemed improper *at that time*. *Id.* The court's point was that "obscenity" does not have any immutable or transcendent legal meaning. Unlike the population of conventional wrongs identified as historical exceptions in *Robertson*, including, for example, perjury, fraud and theft, whose elements are both constant and widely understood, obscenity-based crimes largely follow the mores of an era.[20]

The dissent advances a novel method in order to bypass the dilemma posed by *Henry*. The dissent suggests that, whatever the difficulties inherent in defining obscenity may be, restraint of the specific conduct proscribed by ORS 167.065(1)(a) is indisputably a well-established exception to the guarantee of Article I, section 8. After all, the dissent reasons, before 1859, nobody ever thought that government lacked the authority to protect children from such material.

The problem with that argument is that it takes the historical exception analysis beyond its rational limits. The dissent points to few specific prohibitions constituting precise

---

[20] For example, nineteenth-century prosecutions were not uncommon in the United States for the "obscene" distribution of birth control information. *See Commonwealth v. Tarbox*, 55 Mass (1 Cush) 66, 67 (1848); Frederick F. Schauer, *The Law of Obscenity*, 13 (1976).

historical antecedents to any of the three remaining proscriptions contained in ORS 167.065(1)(a). The truth is, we cannot say whether the paucity of evidence on the subject is owing to the sensibilities of another era, to the possibility that sadomasochistic abuse, for example, may have been largely unknown to the framers of the Oregon Constitution, or because of some other cause about which we are not free to speculate.

Even more fundamentally, however, the dissent's shift in focus from the ill-defined term "obscene" to a narrower band of specific conduct reflects a blurring of the methodology of Article I, section 8, analysis. We agree, as we have explained, that the state has the authority to restrain the distribution to minors of the materials proscribed by ORS 167.065(1)(a). However, as the Supreme Court made clear in *Stoneman*, that authority derives from the power of government to regulate conduct that has identifiable harmful effects on children, even though freedom of expression may be burdened in the bargain. 323 Or at 549. That authority does not derive from a historical search for nineteenth-century (or earlier) values and beliefs about the meaning of obscenity.

*Robertson* identified a small handful of possible historical exceptions that were specific, well-defined, and undisputably entrenched in common law. Whether or not the *Robertson* compendium is open ended, it is likely a very short list, as well it should be. At best, history is hard to establish convincingly. The limitation of *Robertson's* unique historical exception analysis to a narrow band of wrongs, with clearly established elements that describe specific prohibitions, avoids the even more artificial process of distillation and revision proposed by the dissent. Because the dissent sets the bar too low, it would emblazon nineteenth-century thinking on twentieth-century challenges in the law of obscenity, without the screening value of overbreadth review.

The dissenting judges believe that it is necessary first to consider whether the statute reflects a historical exception; in concluding that it does, they overlook its overbreadth. However, that problem should not be so lightly dismissed. The pioneers would likely be bewildered, if not

speechless, at much of what is today regarded as acceptable expression relating to what the statute defines as "sexual excitement" and "sexual conduct." In the intervening period, society, in general, has become more tolerant of stark and explicit expression that is imbued with sexual themes and undertones—even when it reaches older minors. An evening of channel surfing on commercial television takes that proposition beyond dispute. If the dissenting judges were right, however, people who have no intention of corrupting the morals of minors by exposing them to materials that include, incidentally, depictions of sexual conduct or excitement, are nonetheless criminals. How can a statute capable of producing results so obviously out-of-step with the modern limits of tolerance nonetheless be sanctioned by a historical exception? In the answer to that question lie puzzles that are presented, but not solved, by *Robertson* and its progeny.

The dissents focus, for example, on the requirement that a historical exception must be well established but they do not consider how an exception can be well established in the age of the framers without also reflecting values that will endure for centuries more. And what of the requirement that the statute be "wholly contained" within a historical exception? By defining it in sweeping terms as the protection of children from obscenity, the dissents craft an exception that may "wholly contain" the statutory offense when we consider, in isolation, the statute's focus on the corrupting effect of obscenity on minors. However, they fail to appreciate that the critical gap between the reach of the offense and the scope of the exemptions created by ORS 167.085(3)—the problem that makes it overbroad—also keeps the offense from being wholly contained within the scope of any reasonably framed exception. How can the proposed exception be so broad that it does not matter whether or not the statute only reaches those persons who actually attempt to titillate minors? Such a result makes no sense and its possibility serves to illustrate why our disagreement about the sequence of analysis has taken on more significance than it should have.

If a statute is effects-based, there is no reason to consider whether it is enshrined by history; it is, however, necessary to separately consider whether it is overbroad. If it is content-based, it may nonetheless reflect a narrowly

articulated exception that should not, perforce, produce unreasonable results. ORS 167.065(1) is overbroad for the same reason that it should not be considered a well-established and durable historical exception. It reaches persons whose communication is not intended to harm minors. When so understood, its overbreadth is both readily apparent and remediable by the legislature. We would be wrong to entomb and preserve its infirmities within the historical vault constructed by the dissent.

Our next disagreement with the dissent lies with the portion of its historical exception analysis addressing whether Article I, section 8, "demonstrably [was] not intended to reach" the regulation of the distribution of obscene materials to children. *Robertson*, 293 Or at 412. We differ with the dissent at two levels. First, the dissent has restated the *Robertson* test in a way that mischaracterizes the relevant question. The dissent asks whether Article I, section 8, "was intended to abrogate the established authority of the state to regulate the distribution of obscene materials to children?" *Robertson*, on the other hand, phrased the question as we have done; namely, whether Article I, section 8, demonstrably was not intended to reach such regulation. The correct phrasing of the test makes clear that the burden is on the proponent of an exception to establish that the exception was intended to survive the adoption of the constitutional guarantee. *See Henry*, 302 Or at 521. Therefore, when the dissent later asserts that it can find no "evidence that the framers of the Oregon Constitution intended to constrain the authority of the state" to engage in such regulation, it mistakenly implies that it must so find in order to disprove the existence of an exception. In fact, the reverse is true.

Regardless, however, of the proper phrasing of the test, the evidence on which the dissent relies in concluding that the alleged exception survived the adoption of Article I, section 8, does not prove the point the dissent wants to make. The dissent asserts that the re-enactment of the 1854 territorial statute as part of the state's first criminal code, and the enactment of similar legislation by Congress and by other states following the Civil War, show that regulation of the distribution of obscenity to minors was both well established

and also was intended by the framers to survive the adoption of the constitution.

█ With respect, all that the cited evidence shows is that legislatures have long recognized that government has the authority to regulate expression when it properly focuses on the forbidden effects of that expression, rather than on its substance. The territorial statute, as later re-enacted, defined its proscription in terms of materials "tending to the corruption of the morals of youth." Virtually without exception, the identical focus on the effects of expression also appeared in the statutes that the dissent cites as examples of the existence of an exception, specifically relating to youth, dating back to the early to mid-nineteenth century. 168 Or App at 182 (Landau, J., dissenting). Those statutes do not reflect a historical exception to freedom of expression in the sense contemplated by *Robertson*. Instead, they constitute durable evidence that the guarantees of free expression simply do not prohibit legislative regulation of harmful effects that arise from that expression.

Convictions on counts 2, 3, and 4 reversed; otherwise affirmed.

**HASELTON, J.,** concurring.

I agree with the majority opinion that: (1) Under *Stoneman*'s contextual analysis, ORS 167.065(1)(a) is "effects-based," not "content-based." (2) The "historical exception" analysis applies only to "content-based" statutes. And (3) ORS 167.065(1)(a) is unconstitutionally overbroad. Given those premises, it is unnecessary to reach, and I do not join in, the majority's substantive discussion of whether the subject of ORS 167.065(1)(a) falls within a historically recognized exception.[1]

---

[1] This is not merely a matter of jurisprudential fastidiousness. I joined the majority in *Maynard I* in concluding that ORS 167.065(1)(a) did not fall within a historically recognized exception—as did Judge Landau. Judge Landau's comprehensive dissent revisits that issue and presents provocative historical evidence and analysis far transcending anything we considered in *Maynard I*. I am not certain that Judge Landau's historical conclusions are right—but I am far from certain that they are wrong. At the least, Judge Landau's dissent highlights some very real and recurring concerns pertaining to the *Robertson* construct generally and the function and content of the "historically recognized exception" qualification specifically.

**ARMSTRONG, J.,** concurring.

The majority holds that *State v. Stoneman*, 323 Or 536, 920 P2d 535 (1996), requires us to repudiate our prior decision in this case and to conclude that ORS 167.065(1)(a) is an effects-based law on expression, albeit one that violates Article I, section 8, of the Oregon Constitution because it is overbroad. The majority is mistaken. Although *Stoneman* refined one aspect of Oregon's free speech analysis, that refinement does not undermine our prior conclusion that ORS 167.065(1)(a) is not an effects-based law. The dissenters take a different tack. They now conclude that laws that protect children against exposure to sexually explicit expression constitute a well-established historical exception to the protection afforded free expression by Article I, section 8, and that ORS 167.065(1)(a) fits within that exception. They, too, are mistaken.

I will try not to repeat what I said at some length in my first concurring opinion in this case. I continue to believe that what I said in that opinion is correct. All that *Stoneman* did was to add a refinement to the relevant analysis.

As I explained in my previous concurrence, the Oregon free speech analysis provides meaningful guidance to lawmakers about the restrictions on expression that they can impose, and it promotes truth in lawmaking on that subject. It does that by drawing a distinction between two types of laws that can be adopted to restrict expression.

One type involves laws that come within a well-established historical exception to the protection afforded free expression by Article I, section 8. For the most part, laws of that type are laws that can be characterized as conventional crimes involving expression. They include "perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants." *State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982). The Supreme Court distinguished in *Robertson* between conventional and other historical crimes involving expression

"so as not to imply that constitutional freedom of expression today does not extend to crimes known before the Bill of

Rights, such as seditious or criminal libel, that restrained freedom of public disclosure and debate."

*Id.* at 433 n 28. In that light, a crime is a conventional crime if it restricts expression to prevent its use as an instrument to cause harm. For example, laws against fraud restrict expression to prevent people from using it to take money from other people by dishonest means, and laws against perjury and false swearing do so to prevent people from using expression to impair governmental functions that depend on accurate information. That type of purpose contrasts with laws that restrict expression to control behavior by controlling people's ideas and beliefs. For example, laws against seditious libel restrict expression about the government in order to control people's attitudes and behavior toward it. Similarly, a law that restricted the dissemination of racist literature to prevent people from developing racist beliefs and acting on those beliefs would not be a conventional crime involving expression.[1]

The distinction between conventional and other crimes involving expression is important, because it bears on whether the laws on those crimes survived the adoption of Article I, section 8. To have survived, the laws must have been well established at the adoption of Article I, section 8, and must demonstrably have been intended to survive its adoption. *Robertson*, 293 Or at 412. *Robertson* suggests that well-established conventional crimes involving expression survived the adoption without the need to demonstrate that they were intended to survive it, but crimes that were *not* conventional crimes must be shown to have been intended to survive it. *See id.* at 433. *See also State v. Moyle*, 299 Or 691,

---

[1] Of course, a law against fraud could be characterized as a law that controls people's beliefs, for example their belief about the characteristics of a product, and their behavior as a result of those beliefs, the purchase of the product. The point, however, is that a conventional crime such as fraud is not concerned with expression as such, for example with whether someone makes a false statement about a product, but only with its use to produce the proscribed harm: taking a person's money. Laws that fall outside that principle are laws that proscribe expression independently of its effects. The proscribed expression presumably has objectionable effects (if nothing else, that a sufficient number of people do not like it), but the imposition of the restriction does not depend on the expression having any particular effect.

696, 705 P2d 740 (1985) (holding that subsection of harassment statute prohibiting certain threats was not part of a well-established historical exception).

The role that that type of law plays for lawmakers who want to restrict expression is limited, because few laws come within an historical exception. However, lawmakers concerned about conduct that is regulated by such laws

"may revise [those laws] and extend their principles to contemporary circumstances or sensibilities. If it was unlawful to defraud people by crude face-to-face lies, for instance, free speech allows the legislature some leeway to extend the fraud principle to sophisticated lies communicated by contemporary means. Constitutional interpretation of broad clauses locks neither the powers of lawmakers nor the guarantees of civil liberties into their exact historic forms in the 18th and 19th centuries, as long as the extension remains true to the initial principle."

*Robertson*, 293 Or at 433-34 (citations omitted).

The second type of law that Article I, section 8, permits lawmakers to adopt are laws that focus on the effects of expression.

"A law of that kind is [one] that expressly or by clear inference identifies the effects [that] it addresses, and that applies when the effects are shown to exist. * * *

"To be valid under Article I, section 8, such a law must satisfy the following test: First, the effects to which the law is directed must be effects that the state lawfully can address by restricting expression. * * * Second, the law must function so that it applies *only* when the harmful effects to which it is addressed are shown to exist. * * * Finally, the law must not reach constitutionally privileged communication, that is, it must not prohibit or regulate expression in which people have a privilege to engage without governmental interference."

*State v. Maynard*, 138 Or App 647, 657-58, 910 P2d 1115 (1996) (Armstrong, J., concurring) (emphasis in original; citations omitted), *vacated and remanded* 327 Or 582, 964 P2d 264 (1998).

The refinement that *Stoneman* introduced concerns the second part of the test. Generally, effects-based laws restricting expression are written so that the harmful effects against which they are addressed are made operative elements of the laws, thereby satisfying the requirement that the restrictions apply only when the effects are present, because the effects must be shown to exist for the restrictions to apply. *See, e.g., Moser v. Frohnmayer*, 315 Or 372, 379-80, 845 P2d 1284 (1993); *City of Portland v. Tidyman*, 306 Or 174, 184-91, 759 P2d 242 (1988). *Stoneman* involved a criminal law in which the harmful effect to which the law was addressed was *not* made an express element of the crime. However, the harm necessarily was present whenever the proscribed expressive material was shown to exist, so the law would apply only when the harmful effect was present. *Stoneman*, 323 Or at 545-49.

The law in *Stoneman* prohibited the purchase of visual reproductions of children engaged in unlawful sexual conduct. The court identified the harm against which the law was addressed as the sexual abuse of children involved in the production of the proscribed material. The court concluded that the law

> "prohibited the purchase of certain communicative materials, not in terms of their communicative *substance*, but in terms of their status as the products of acts that necessarily have harmed the child participants. So understood, it will be seen that the statute punished sexual exploitation by *commerce* that is a continuation and an integral part of the underlying harmful acts."

*Stoneman*, 323 Or at 548 (emphasis in original). Given the harm against which the law was addressed, the state would necessarily establish that harm by establishing the content of the proscribed material. Hence, the law satisfied the second part of the test for effects-based laws, because it restricted expression only when the harmful effects against which it was addressed existed.

Contrary to the lead opinion's view, the law at issue in this case, ORS 167.065(1)(a), fails that test. The law prohibits people from furnishing expressive material to children that depicts certain forms of sexual conduct. The lead opinion

identifies the harm against which that prohibition is addressed as the sexual stimulation or arousal of children. *See* 168 Or App at 123-25. The problem is that the prohibition is written in terms of the content of the material rather than the purpose for which it is furnished. Consequently, the prohibition applies without regard to whether the material caused, or would cause, the identified harm.

Two examples should illustrate the point. A 17-year-old boy finds some X-rated magazines that his father had purchased years earlier and had left in a box in the basement of their home. The 17-year-old confronts his 16-year-old brother with them and asks him whether they are his. The younger brother looks through them and says that they are not. The older brother returns them to the box and admonishes the younger brother not to retrieve them. The older brother would violate ORS 167.065(1)(a) by giving the magazines to his younger brother, without regard to whether that act would or did cause the brother to be sexually stimulated or aroused.

More starkly, as a joke, an adult gives his blind, 17-year-old brother an X-rated magazine and tells him that it is a news magazine that contains an interesting story that he should share with his teacher at school. The younger brother takes it to school and presents it to his teacher, who promptly confiscates it. The older brother's act in furnishing the magazine to his younger brother would violate ORS 167.065(1)(a) even though, in doing so, he did not, and could not, cause his younger brother to be sexually stimulated or aroused.

As the examples demonstrate, the state is not required to show that the material that ORS 167.065(1)(a) prohibits people from furnishing to children had any effect, including the effect identified by the majority. The state need show only that the material is of the type that the law proscribes. That was also true with the law in *Stoneman*, with one, critical difference. There, the proscribed material, itself, embodied the harmful acts that the state sought to prevent by prohibiting commercial distribution of the material:

"Of paramount importance to [the *Stoneman*] holding was the fact that child abuse is a harm that properly is subject to government proscription and that such abuse *necessarily*

had to occur in order to produce the expressive conduct in question."

*Vannatta v. Keisling*, 324 Or 514, 538, 931 P2d 770 (1997) (emphasis in original). Here, furnishing to children the expressive materials covered by ORS 167.065(1)(a) will not *necessarily* cause any harmful effect, let alone the harmful effect that the lead opinion infers that the law seeks to prevent. Consequently, *Stoneman* adds nothing relevant to the determination whether ORS 167.065(1)(a) is an effects-based law. It is not such a law, because no harmful effect necessarily occurs or needs to be shown for the law to apply. The lead opinion errs in concluding otherwise.[2]

The last time that this case was before us, four members of the court wrote opinions on the constitutionality of ORS 167.065(1)(a), and none of them concluded that the law fit within a well-established historical exception to the protection afforded free expression. *Stoneman* rejected the state's argument that the law at issue in that case came

---

[2] Moreover, even when sexual stimulation or arousal occurs as a result of furnishing sexually explicit material to children, it is not clear whether, in light of current law, that necessarily causes or could cause harm. Assume that two sexually active 17-year-olds are in a committed relationship. They commit no crime and violate no law by engaging in sexual activity together, and there is no prohibition against their use of sexually explicit language to stimulate or arouse each other sexually. However, if the girl gives her boyfriend photographs that she took of the two of them engaged in sexual activity, a sound recording of them engaged in that activity, or a sexually explicit note, she would violate the law against furnishing sexually explicit expressive material to children. ORS 167.065(1). It is unclear why some expression that could lead to sexual stimulation or arousal is harmful, but some of the same expression and the sexual activity itself are not considered harmful enough to merit restriction. Had the law been written to address effects, the legislature would have been required to identify the circumstances in which it is harmful to give children expressive material that could cause them to be sexually stimulated or aroused. Instead of doing that, the legislature wrote a law that imposes a blanket prohibition on providing certain sexually explicit material to children, coupled with blanket exemptions to that prohibition. The effect of doing that is to permit some people but not others to give the proscribed material to children. For example, a librarian can allow a child to borrow an X-rated book, videotape, or magazine from a library, but a commercial bookseller or video store cannot rent or sell the same thing to the child. *See* ORS 167.065(1); ORS 167.085(2). It is difficult to see the distinction between those two acts in terms of any harm caused to the child. The whole point of the Oregon analysis is to require lawmakers to write laws restricting expression in terms of the harmful effects that the restrictions seek to prevent, because that requirement forces lawmakers to agree on those effects and to confront the problems that imposing the restrictions create. The lead opinion permits the legislature to avoid that task and thereby undercuts the entire analysis.

within such an exception, and nothing about the court's treatment of that issue in *Stoneman* altered in any way the analysis that applies to the resolution of that issue in this case. *Stoneman*, 323 Or at 545. Nevertheless, the dissents now conclude that ORS 167.065(1)(a) fits wholly within a recognized historical exception and, hence, does not violate Article I, section 8.

The dissents rely for their conclusion on a body of law that prohibited the dissemination of certain sexually explicit or obscene material to anyone. That body of law developed over a 150-year period from the early eighteenth century through the adoption of our constitution. It sought to control sexual attitudes and behavior by controlling access to expressive materials that depicted or described sexual activity. It developed as an outgrowth of a body of law on seditious libel and blasphemy that sought to control public attitudes and behavior toward government and religious institutions by controlling access to information that was inconsistent with the views of those institutions.[3]

The Supreme Court considered that body of law in *State v. Henry*, 302 Or 510, 514, 732 P2d 9 (1987), to determine whether it constituted a well-established historical exception on which the state could rely to uphold a law that prohibited the dissemination of certain sexually explicit material to anyone, adults and children alike. The court held

---

[3] *Queen v. Read*, 2 Strange 789, 88 Eng Rep 953 (KB 1708), is the first published case in which English or colonial courts considered whether obscene libel constituted a crime. The court held that it did not:

"A crime that shakes religion, as profaneness on the stage, &c. is indictable; but writing an obscene book, as that intitled [sic], 'The Fifteen Plagues of a Maidenhead,' is not indictable, but punishable only in the Spiritual Court."

*Read*, 88 Eng Rep at 953 (footnotes omitted). Hence, as of 1708, seditious and profane expression could be penalized by the government, but obscene expression could not. The court reversed itself 19 years later in *Rex v. Curl*, 2 Strange 788, 93 Eng Rep 849 (KB 1727), adding obscene libel to the existing restrictions on expression. *Curl* was followed by *Rex v. Wilkes*, 4 Burrow 2527, 98 Eng Rep 327 (KB 1770), in which John Wilkes, an opponent of King George III and his government's policies in North America, was convicted of publishing "a seditious and scandalous libel" (*The North Briton*) and an "obscene and impious libel" (*Essay on Woman*). After the United States was established, a number of states and the federal government built on the English common law of obscene libel through court decisions and statutes.

that it did not. *Id*. at 522-23. Nevertheless, the dissents conclude that that *same* body of law constitutes a well-established historical exception for laws that restrict the dissemination of the *same* type of material to children. I am at a loss to understand how that can be. For an historical exception to apply, the law on which the lawmaker relies for the exception must have been well established and must demonstrably have been intended to survive the adoption of Article I, section 8. *Robertson*, 293 Or at 412. The dissents do not explain, because they cannot, how a uniform body of law that imposed a blanket prohibition on the dissemination of sexually explicit material to everyone can be divided into two parts: one part directed toward adults that was not well established and that was not demonstrably intended to survive adoption of the free speech guarantee (*Henry*) and one part directed toward children that was. The law on which they rely draws no such distinction. Everything that the dissents offer as support for their contention that ORS 167.065(1)(a) comes within a well-established historical exception applies equally to whether the statute at issue in *Henry*, ORS 167.087, came within such an exception. If that body of law did not meet the test in *Henry*, it cannot meet it here.[4]

At bottom, the law on obscene libel is not law that involved a conventional crime. It is law that is indistinguishable in its character from that of seditious and criminal libel. That entire body of law sought to restrict expression in order to control ideas and beliefs and the behavior that might result from them. The Supreme Court has concluded in *Robertson*, *Henry*, and *Wheeler v. Green*, 286 Or 99, 117-19,

---

[1] One way that Judge Landau tries to finesse that problem is by reversing the relevant test. The test requires the state to demonstrate that the applicable law on which it relies for an historical exception was intended *to survive* the adoption of the constitutional guarantee. *See Robertson*, 293 Or at 412. Judge Landau turns that around by asserting that nothing demonstrates that the law on which it relies for an historical exception was intended *to be displaced* by the adoption of Article I, section 8. *See* 168 Or App at 190-92. That focus is precisely backwards. Moreover, as I explain in the text, no matter what the test, the information that the dissenters offer to satisfy the test is the same information that applied to whether the law at issue in *Henry* came within such an exception. *See also State ex rel Oregonian Pub. Co. v. Deiz*, 289 Or 277, 283-84, 613 P2d 23 (1980) (notes that restrictions on civil liberties adopted contemporaneously with Oregon Bill of Rights are not much use in interpreting Bill of Rights). If *Henry* said that it did not, we cannot reach a contrary conclusion while remaining faithful to our obligation to follow Supreme Court decisions. Only the Supreme Court can do what the dissents would do here.

593 P2d 777 (1979), that none of that law survived the adoption of Article I, section 8. We cannot conclude otherwise.[5]

Finally, as I explained in my first concurrence in this case,[6] a conclusion that ORS 167.065(1)(a) violates Article I, section 8, does not mean that the state is powerless to protect children against the harmful effects of exposure to sexually explicit material. The state can address those effects, but it must do so through laws that focus on the effects rather than on the expression itself.

**EDMONDS, J., dissenting.**

Defendant is charged under ORS 167.065(1)(a) with unlawfully and knowingly furnishing to three minor children "a picture, photograph, or other visual representation or image depicting sexual intercourse, a male touching a female vagina with his mouth, a female touching a male penis with her mouth, or an erect male penis, knowing or having good reason to know the character of the material furnished." The majority holds that ORS 167.065(1)(a) is unconstitutionally overbroad because it unlawfully restricts defendant's freedom of protected expression under Article I, section 8, of the Oregon Constitution. Judge Landau, in a thoughtful dissent based on exhaustive research, correctly points out that defendant's conduct falls within a historical exception to section 8. I agree with his conclusion.

I write to share some additional commonsense observations about what history tells us regarding how the people of the State of Oregon would have regarded defendant's conduct at the time of the adoption of the constitution.

---

[5] Judge Landau questions the basis for the distinction that the Supreme Court drew in *Robertson* between conventional and other crimes involving expression. *See* 168 Or App at 175-76. The Supreme Court recognized the distinction because there is a difference between laws that restrict expression to prevent its use as an instrument to cause identifiable harm and those that restrict expression to control ideas and beliefs. The court concluded that Article I, section 8, was not intended to displace well-established laws that served the former purpose but was intended to displace laws that served the latter purpose. *See, e.g., Robertson*, 293 Or at 433 & n 28; *Moyle*, 299 Or at 696. The law on obscene libel is an example of the latter. Our task as an intermediate appellate court is to apply the distinction, not to explain why it is untenable.

[6] *See Maynard*, 138 Or App at 669-70 (Armstrong, J., concurring).

My beginning point is the language of ORS 167.065(1)(a). The statute provides:

"(1)   A person commits the crime of furnishing obscene materials to minors if, knowing or having good reason to know the character of the material furnished, the person furnishes to a minor:

"(a)   Any picture, photograph, drawing, sculpture, motion picture, film or other visual representation or image of a person or portion of the human body that depicts nudity, sadomasochistic abuse, sexual conduct or sexual excitement[.]"

ORS 167.060 furnishes definitions for ORS 167.065(1)(a):

"(3)   'Furnishes' means to sell, give, rent, loan or otherwise provide.

"* * * * *

"(5)   'Nudity' means uncovered, or less than opaquely covered, post-pubertal human genitals, pubic areas, the post-pubertal human female breast below a point immediately above the top of the areola, or the covered human male genitals in a discernibly turgid state. For purposes of this definition, a female breast is considered uncovered if the nipple only or the nipple and areola only are covered.

"* * * * *

"(9)   'Sadomasochistic abuse' means flagellation or torture by or upon a person who is nude or clad in undergarments or in revealing or bizarre costume, or the condition of being fettered, bound or otherwise physically restrained on the part of one so clothed.

"(10)   'Sexual conduct' means human masturbation, sexual intercourse, or any touching of the genitals, pubic areas or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification.

"(11)   'Sexual excitement' means the condition of human male or female genitals or the breasts of the female when in a state of sexual stimulation, or the sensual experiences of humans engaging in or witnessing sexual conduct or nudity."

Article I, section 8, provides, in part:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for abuse of this right."

The original Oregon Constitution, of which section 8 is a part, was written by a convention of 60 delegates chosen from the citizens of the territory. The convention met in August 1857. Thereafter, it was approved by a vote of the people. On February 14, 1859, Congress acted to admit Oregon into the Union, and on that date, section 8 went into effect. Section 8

"forecloses the enactment of any law written in terms directed to the substance of any 'opinion' or any 'subject' of communication unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach." *State v. Robertson*, 293 Or 402, 412, 649 P2d 569 (1982).

The "bottom line" question in this case is whether the people of this state in 1859 would have considered the proscription of ORS 167.065(1)(a) on its face to have infringed on the guarantees of section 8. The analysis of the answer to that question begins with an understanding of how a historical exception operates within the framework of section 8. "In principle, * * * a claim of 'overbreadth' asserts that the terms of a law exceed constitutional boundaries, purporting to reach conduct protected by guarantees such as, for instance, Oregon Constitution, article I, section 8 (freedom to speak and write)[.]" *Id.* at 410. "If a law concerning free speech on its face violates [section 8], it is unconstitutional; it is not necessary to consider what the conduct is in an individual case. If the law is not unconstitutional on its face, it nevertheless might be applied in a manner that would violate [section 8]." *State v. Spencer*, 289 Or 225, 228-29, 611 P2d 1147 (1980).

The methodology in analyzing section 8 issues can be found in cases like *State v. Moyle*, 299 Or 691, 705 P2d 740 (1985). In deciding whether a statute prohibiting harassment

infringed on freedom of expression, the court first examined whether the statute on its face was a law

> "whose very enactment was forbidden by Article I, section 8[.] * * * Even when a law by its terms restricts the right to speak, we have held that it does not, on its face, violate our state constitutional guarantee if the crime was one well established at the time our constitutional guarantee was enacted and demonstrably outside the aims of the guarantee of freedom of expression, *or* if the statute as written proscribes some effect, rather than communication itself. *State v. Robertson,* [ ] 293 Or at 412, 416; *State v. Garcias,* 296 Or 688, 689, 679 P2d 1354 (1984)." *Moyle,* 299 Or at 695-96 (emphasis added).

After concluding that the law in question did not fall within a historical exception, the *Moyle* court then turned to the focus of the law and inquired whether it was a law directed against speech or at preventing a forbidden effect. *Id.* at 697. Having concluded that the law focused on effect rather than speech itself, the court next posed the question of whether the effect of the law could be proscribed under section 8. *Id.* at 699. It noted that when a statute defines a crime that results only from expression, its potential reach must be "scrutinized to determine whether it appears to reach privileged communication or whether it can be interpreted to avoid such 'overbreadth' " by a narrowing construction. *Id.* at 702 (quoting *Robertson,* 293 Or at 418).

Under an appropriate analysis, the lead opinion's overbreadth analysis is never reached if the language of ORS 167.065(1)(a) falls wholly within a historical exception. By definition, a law that in whole reflects a historical exception to protected speech could not infringe on protected expression. Therefore, there can be no need to further scrutinize a challenged law if in fact it constitutes a historical exception to the guarantees of section 8. Just as statutes that embody the historical exceptions of perjury, solicitation of criminal conduct and some forms of theft, forgery and fraud are statutes that are aimed at harmful effects and, therefore, are not subject to an overbreadth analysis, so too is ORS 167.065(1)(a) historical exception not subject to an overbreadth analysis.[1]

---

[1] The lead opinion relies on the holding in *State v. Plowman,* 314 Or 157, 838 P2d 558 (1992), *cert den* 508 US 974 (1993), for the assertion that the historical

In that light, would the people of this state in 1859 have believed that the furnishing of visual depictions to children that portray sadomasochistic abuse, sexual conduct or sexual excitement by someone, other than those who qualify under the statutory exemptions,[2] to have been protected expression under section 8? The inquiry is solely one of examining historical fact in light of the information available to us from the period surrounding 1859. "The first part of the *Robertson* test for determining whether a restriction on expression comes within a historical exception focuses on whether the restriction was well established when the early American guarantees of freedom of expression were adopted[.]" *State v. Henry*, 302 Or 510, 515, 732 P2d 9 (1987). "The second part of the *Robertson* test determines whether Article I, section 8, was intended to eliminate that restriction." *Moser v. Frohnmayer*, 315 Or 372, 376, 845 P2d 1284 (1993).

Judge Landau's research demonstrates unequivocally that restrictions on expression that were harmful to children or that "tended to corrupt the morals of youth" were uniformly believed by nineteenth-century Americans not to

---

exception analysis applies *only* to statutes that focus exclusively on the content of expression. The lead opinion reads too much into the opinion in *Plowman*. *Plowman* undertook to initially analyze whether the statute at issue in that case focused on content of speech or proscribed forbidden results of speech because there was no historic exception issue before the court. As the *Robertson* court pointed out, 293 Or at 412, the analysis forks depending on whether there is a putative historical exception. When there is no historical exception available, then the analysis turns first to whether the statute proscribes content of speech or only effects from speech. If a historical exception applies, it can make no difference to the order of the methodology of analysis because section 8 is never implicated.

[2] ORS 167.085 provides that it is a defense to any prosecution under ORS 167.065(1) that the defendant was in a parental or guardianship relationship with the minor to whom the materials were furnished. Other exemptions include individuals acting on behalf of "bona fide school[s], museum[s] or public librar[ies]" and when the furnishing serves a purpose other than sexual titillation. The lead opinion concedes that the provisions of ORS 167.085(3) serve to identify ORS 167.065's purpose of being aimed at the unlawful forbidden effect of sexual titillation of minors. 168 Or App at 126. Nonetheless, it views the statute as inadequate to protect expression not intended for sexual titillation. 168 Or App at 127 n 13. However, ORS 167.085 clearly exempts material from prosecution that serves "some legitimate purpose therein other than titillation[.]" None of the examples in Judge Armstrong's concurrence involves furnishing for the purpose of sexual titillation. In my view, the breadth of the exemptions in ORS 167.085 operate with the provisions of ORS 167.065 to circumscribe the reach of ORS 167.065 so as to bring it wholly within a historical exception to protected expression.

infringe on protected expression. The Judeo-Christian ethics and traditions reflected by a majority of the populace at that time esteemed and promoted the value of protecting young people from deleterious influences with the same vigor that they condemned perjury, solicitation to commit crimes, theft and fraud. It is hard to imagine a more conventional, fundamental belief held by that society than a belief that children should be protected from those who would endeavor to encourage them to become involved in prurient behavior.

Moreover, it is undeniable that both the territorial legislature and the Oregon Legislature during the time of the adoption of section 8 were concerned about the furnishing of materials that were manifestly intended to corrupt the morals of youth as were numerous other state legislatures. To assert that such a concern was not "conventional" or that section 8 was intended to eliminate such restrictions is to controvert established historical fact. Chapter XI, section 10, of the Statutes of Oregon 1854, pp 210-11, and the same provision of the Statutes of Oregon 1855, Chapter XI, section 10, p 234 (Deady 1855), are illustrative of how such concerns were embodied by statutes. They provided:

> "If any person shall import, print, publish, sell or distribute any book or any pamphlet, ballad, printed paper or other thing containing obscene language or obscene prints, pictures, figures or other descriptions, manifestly tending to the corruption of the morals of youth, or shall introduce into any family, school or place of education, or shall buy, procure, receive, or have in his possession, any such book, pamphlet, ballad, printed paper or other thing, either for the purpose of loan, sale, exhibition or circulation, or with intent to introduce the same into any family, school, or place of education, he shall, on conviction, be punished by imprisonment in the county jail not more than six, nor less than three months, or by a fine not more than three hundred dollars, nor less than fifty dollars."

The identical statute was enacted by the state legislature in 1864 after the adoption of the constitution.

The reach of ORS 167.065(1)(a) is even more restricted than the reach of earlier Oregon statutes that made it unlawful to "introduce [obscene material] into any

family, school or place of education[.]" As the Supreme Court has consistently pointed out in *Henry*, 302 Or at 525, and *State v. Stoneman*, 323 Or 536, 543 n 7, 920 P2d 535 (1996), its rejection of a historical exception based on those earlier statutes for a prohibition on furnishing obscene material to consenting adults does not foreclose their pertinence to furnishing materials to children. ORS 167.065(1)(a) is directed solely at the harm of furnishing obscene material to children, and defendant is charged with furnishing pornography to children. It may be that the earlier statutes as they pertain to obscene material unconnected to children could not have withstood scrutiny under section 8. However, that possibility does not impinge on the consideration of 1859 societal attitudes concerning children and the effect of pornography on them. This concern about the corruption of the morals of youth in the earlier Oregon statutes and their contemporaries is a consistent and common statutory theme that, in my opinion, affords compelling evidence that such a historical exception exists.

The question becomes: What would a modern day statute reflecting the historical exception under section 8 prohibiting the furnishing of materials that manifestly tend to corrupt the morals of youth look like? An examination of the texts of the territorial and 1864 statutes provide clues: (1) The statute would have to prohibit expression directed toward minors; (2) The statute would have to proscribe materials that "manifestly" tend to corrupt the morals of minors; (3) The statute would have to be restricted to expression that fell within the public's understanding of the word "obscene."

The next step is to compare the elements of ORS 167.065(1)(a) with the above elements. Both statutes encompass the furnishing of material that will affect minors, who are deemed not to have the maturity to consent or to respond appropriately to sexually stimulating materials. The phrase "manifestly tending to corrupt the morals of youth" in the earlier statutes suggest that under some circumstances, expression that otherwise was considered "harmful" would be exempt from proscription when such expression did not have the effect of corrupting the morals of youth. For example, depictions of sexual conduct used for purposes of teaching human sexuality in a proper setting would not have the

harmful effect that is contemplated by the statutes. In comparison, the exemptions to ORS 167.065(1)(a) under ORS 167.085 embody similar concepts when the corrupting influence of sexual titillation is absent.

The final element involves a comparison between the element of "obscenity" in the earlier statutes and the definitions of "sadomasochistic abuse," "sexual conduct" and "sexual excitement." The word "obscene" is a word that has caused courts much difficulty in defining. Apparently, the majority seizes on that difficulty as an alternative means to reject the assertion that a historical exception for furnishing pornography to children exists. But it does not necessarily follow that, because some definitions of historical obscenity lack certainty, all definitions are unascertainable. Rather, each case needs to be decided within its own historical context. For instance, the fact that the Supreme Court in *Henry* ruled that restrictions on obscene expression involving consenting adults were not well established at the time of adoption of section 8 says little about the nature of restrictions on expression to children. This case requires us to reason anew about what kind of understanding the people of the State of Oregon would have had in mind about the meaning of the word "obscene" insofar as children are concerned when they voted for the adoption of the constitution. Whatever else were the parameters of the meaning of the word "obscene" at that time, it cannot be reasonably debated from the historical information that a nineteenth-century elector in Oregon would have considered depictions of human masturbation, sexual intercourse, the touching of genitals or intimate sexual body parts, sexual stimulation and sexual flagellation or torture to be included within its meaning. Consequently, all of the core elements of the early statutes are wholly contained within the prohibitions of ORS 167.065(1)(a), regardless of what disputes may exist regarding whether other expressions were considered obscene.

The above comparison leads me to ask rhetorically: If ORS 167.065(1)(a), as limited by its definitions of prohibited depictions and exemptions thereto, does not embody an established historical exception under section 8, is it possible to conceive of a different statute that could constitutionally prohibit the furnishing of pornography to children? For me,

there are only two possible answers to the issue posed by this case. Either ORS 167.065(1)(a) is wholly embodied within the historical exception or there is no protection available for our children from those who would furnish pornography to them of the kind described here. Because I enjoy Oregon history, I occasionally wander through the pioneer cemeteries in Polk County and reflect on what life must have been like in the "Garden of Eden"[3] at the time of statehood. Based on my understanding of their beliefs and values, it is hard for me to imagine that the pioneers buried in those cemeteries would even be having the debate in which this court finds itself embroiled.

I dissent.

**LANDAU, P. J.,** dissenting.

At issue in this case is the constitutionality of ORS 167.065(1)(a). That statute prohibits providing to minors depictions of "sadomasochistic abuse, sexual conduct or sexual excitement." A majority of this court holds that the statute is unconstitutionally overbroad, in violation of Article I, section 8, of the Oregon Constitution. I am not persuaded.

I believe that the prohibitions contained in ORS 167.065(1) are wholly contained within a historical exception to the guarantee of free expression contained in Article I, section 8. I therefore would not reach the question whether the statute is overbroad under the state constitution. I likewise would not reach the question whether the statute is overbroad under the federal constitution, because defendant did not preserve that issue. Even assuming the issue was preserved, I would conclude that the statute is not overbroad.

## I.  BACKGROUND

This appeal finds its origins in defendant's demurrer to his indictment for violating ORS 167.065(1)(a) by knowingly furnishing to minor children pictures depicting sexual conduct. Defendant argued that the statute was unconstitutional, because we had determined that the statute was

---

[3] Historical journals of the Oregon pioneers and promotional materials often referred to the Oregon territory as the "Garden of Eden" in the 1840s and 1850s.

unconstitutionally overbroad in *State v. Frink*, 60 Or App 209, 653 P2d 553 (1982), and *State v. House*, 66 Or App 953, 676 P2d 892, *mod* 68 Or App 360, 681 P2d 173 (1984), *aff'd on other grounds* 299 Or 78, 698 P2d 951 (1985). The state argued that the effect of *Frink* and *House* was more limited. According to the state, those decisions merely declared that the portion of ORS 167.065(1)(a) that prohibited furnishing to minors materials depicting "nudity" was unconstitutionally overbroad and that the remaining portions of the statute were unaffected. The state further argued that the remaining portions of the statute are not unconstitutionally overbroad. The trial court overruled the demurrer.

On appeal, defendant argued that the statute violated Article I, section 8. He also asserted for the first time that it was unconstitutionally overbroad under the United States Constitution. We held that the statute violated Article I, section 8, and did not reach the alternative argument. *State v. Maynard*, 138 Or App 647, 910 P2d 1115 (1996). We held that the state was correct in asserting that the effect of *Frink* and *House* was merely to strike from ORS 167.065(1)(a) the prohibition referring to the depiction of nudity and to leave intact the remaining portions of the statute that prohibit furnishing to minors materials that depict "sadomasochistic abuse, sexual conduct or sexual excitement." We held that the remaining portions of the statute, however, were unconstitutional, as well.

Following the method of analysis dictated by *State v. Robertson*, 293 Or 402, 412-18, 649 P2d 569 (1982), and its progeny, we began by concluding that the statute prohibited activity that involves speech or expression and that the focus of the statute was on expression itself, not merely a harmful effect of the expression. We then concluded that the statutory limitations on expression were not wholly contained within a historical exception to the protections of Article I, section 8, and are therefore unconstitutional.

Meanwhile, the Supreme Court issued its opinion in *State v. Stoneman*, 323 Or 536, 920 P2d 535 (1996). At issue in that case was the constitutionality of ORS 163.680 (1987), which made it unlawful for any person

"to pay or give anything of value to observe sexually explicit conduct by a child known by the person to be under 18 years of age, or to pay or to give anything of value to obtain or view a photograph, motion picture, videotape or other visual reproduction of sexually explicit conduct by a child under 18 years of age."

The court began by describing an analytical process slightly different from the one that we applied in our original opinion in this case:

"We begin * * * by deciding whether ORS 163.680 (1987) was on its face 'written in terms directed to the substance of any "opinion" or any "subject" of communication.' A statute that is so written is invalid on its face, unless it fits 'wholly' within some 'historical exception.'

"If the enactment's restraint on speech or communication lies outside an historical exception, then a further inquiry is made—whether the *actual focus* of the enactment is on an *effect* or *harm* that may be proscribed, rather than on the substance of the communication itself. If the actual focus of the enactment is on such a harm, the legislation may survive scrutiny under Article I, section 8. If such a statute expressly prohibits certain forms of expression, it must survive an overbreadth inquiry before it can be found constitutional.

"Even statutes that do not by their terms implicate speech or expression—*i.e.*, statutes that are by their terms aimed only at 'effects'—also are subject to challenge under Article I, section 8, on vagueness grounds or on the ground that the statute's reach, as applied to defendant, extends to privileged expression. Finally, and even if a restraint on freedom of speech or expression cannot be justified under any of the foregoing considerations, it may nonetheless be justified under the 'incompatibility exception' to Article I, section 8."

*Stoneman*, 323 Or at 543-44 (emphasis in original; footnote and citations omitted).

In setting forth the foregoing analytical framework, the court rejected the state's proposal that, because of the importance of protecting children, a different method of analysis was appropriate in evaluating the constitutionality of statutes prohibiting child pornography. The state based

that proposal on *dictum* that appeared in an earlier decision, *State v. Henry*, 302 Or 510, 521-22, 525, 732 P2d 9 (1987), to the effect that it might be possible to regulate obscenity "to protect the unwilling viewer or children." The court concluded that no separate method of analysis was required, but it expressly left open the possibility that the protection of children might constitute a historical exception within the existing analytical framework:

> "Nothing in this opinion * * * should be construed to reflect on the continuing vitality of the implication in *Henry* that the protection of children may constitute an historical exception when assessing the scope of Article I, section 8, thereby removing any state constitutional bar to a statute that is directed at the content of speech but that also falls within the ambit of the exception."

*Stoneman*, 323 Or at 543 n 7 (citation omitted).

The court then turned to the statute at issue. It first concluded that ORS 163.680 (1987) prohibited commerce in certain forms of expression. Accordingly, it turned to the question whether the statute was wholly contained within a historical exception to Article I, section 8. The state argued that the statute, in fact, was contained within a historical exception, as shown by the existence of Chapter XI, section 10, of the Statutes of Oregon 1854, pp 210-11, which was directed at persons who "import, print, publish, sell or distribute [matter] containing obscene language or obscene prints * * * manifestly tending to the corruption of the morals of youth."

The court rejected that argument. *Stoneman*, 323 Or at 545. The court first cited its earlier opinion in *Henry*, in which it rejected the same territorial statute as the basis for finding a historical exception for a modern statute that prohibited the dissemination of "obscene" material, because the territorial statute contained no definition of "obscene" and was directed primarily to the protection of youth. It then referred to this court's opinion in *Stoneman*, in which we also rejected the territorial statute as a historical exception for other reasons, namely, that the territorial statute prohibited only *distribution* to youth while the statute at issue prohibited *purchase*, and that the territorial statute was aimed at

protecting children from *viewing* obscenity while the statute at issue prohibited them from being the *subject* of it. *Stoneman*, 323 Or at 545.

Having concluded that the statute was not wholly contained within a historical exception to Article I, section 8, the court then addressed whether the actual focus of the statute was harmful effects rather than expression itself. The court concluded that the focus of the statute was the former and not the latter and that the statute was narrowly tailored to reach only those harmful effects and did not extend to privileged expression. *Id.* at 550.

Following the issuance of the *Stoneman* decision, the Supreme Court vacated our decision in this case and remanded for reconsideration in light of that decision. On reconsideration, a majority of this court[1] holds that *Stoneman* compels the conclusion that ORS 167.065(1)(a) is aimed at the harmful effects of speech rather than at speech itself. The majority nevertheless concludes that the statute is unconstitutionally overbroad, because it is not limited to prohibiting those harmful effects.

Interestingly, although the Supreme Court remanded for reconsideration in light of *Stoneman*, the majority neglects to apply the analysis that the Supreme Court applied in that case. In particular, the majority omits any consideration of whether ORS 167.065(1)(a) fits wholly within a historical exception to the prohibition of Article I, section 8. That omission is the crux of my disagreement with the majority. In my view, the historical exception analysis cannot be so easily sidestepped.

The majority offers two reasons for its omission of the historical exception analysis. First, it contends that the issue is beyond the scope of the Supreme Court's remand. According to the majority, the Supreme Court intended that we reconsider this case in light of only a discrete portion of the *Stoneman* decision, the portion dealing with the court's effects analysis. 168 Or App at 135. I have searched the

---

[1] I understand that, although Judge Brewer's opinion does not command a majority on all points, it does with respect to this one. Hence, I refer to it as the "majority."

*Stoneman* decision in vain for any suggestion that the scope of our remand is limited to a particular issue; the majority certainly cites none. In any event, I am hard-pressed to understand why the fact that the Supreme Court has remanded this case for reconsideration in light of *Stoneman* somehow renders me powerless to change my mind about a critical portion of our original analysis of this case. As Justice Frankfurter once complained, "wisdom too often never comes, and so one ought not reject it merely because it comes late." *Henslee v. Union Planters Nat. Bank & Trust Co.*, 335 US 595, 600, 69 S Ct 290, 93 L Ed 259 (1949) (Frankfurter, J., dissenting).

Second, the majority complains that, in any event, it is simply inappropriate to engage in the historical exceptions analysis *before* determining whether ORS 167.065(1)(a) concerns speech or the effects of speech. The majority's complaint is ironic. What I propose to do is precisely what the Supreme Court said to do in *Stoneman*: First, determine whether the statute is directed to the substance of any communication; if so, *then* determine whether a historical exception applies. If no historical exception applies, only *then* does the court determine whether the focus of the statute nevertheless is about the effects of speech. The Supreme Court specifically said:

> "We begin that exercise by deciding whether [the challenged statute] was on its face 'written in terms directed to the substance of any "opinion" or any "subject" of communication.' A statute that is so written is invalid on its face, unless it fits 'wholly' within some 'historical exception.'

> *"If the enactment's restraint on speech or communication lies outside an historical exception, then a further inquiry is made—whether the* actual focus *of the enactment is on an* effect *or* harm *that may be proscribed, rather than on the substance of the communication itself."*

*Stoneman*, 323 Or at 543 (emphasis added; citations omitted; footnote omitted).

Indeed, what I have described as the proper order of analysis not only is what the court said to do, but also is what the court actually did, in *Stoneman*. As I have described, in

its analysis of the statute at issue in that case, the court began with the question whether the statute was on its face written in terms directed at the substance of any subject of communication. Concluding that it was, the court *then* examined whether the statute was subject to a historical exception. Concluding that the statute was not, the court *then* turned its attention to whether the focus of the statute was the effects of speech, as opposed to the content of speech. *Id.* at 543-45.

The majority complains that what the court said and did in that case are difficult to square with what the court has said and done in other cases, and with that observation I am inclined to agree. But I leave it to the Supreme Court to retract, explain, or adhere to what it said and did in *Stoneman*. Meanwhile, our charge is to reconsider this case in light of *Stoneman*—all of *Stoneman*. And that is what I attempt to do in this opinion.[2]

In any event, the majority's complaint about the order of the analysis is academic. Even assuming that the order is as the majority describes it, if the focus of ORS 167.065(1)(a) is not about the effects of speech, the historical exception analysis is required. In that regard, I find the majority's analysis unpersuasive. In *Stoneman*, the court held that a statute concerns the effects of speech only to the extent that what is prohibited "*necessarily* involves harm to children." *Stoneman*, 323 Or at 546 (emphasis in original). In that case, the court held that the statute at issue, which prohibited the production of child pornography, necessarily involves harm to children, because the production of such material is inherently exploitative. *Id.* at 548.

In this case, ORS 167.065(1)(a) prohibits the distribution of any material showing sexual conduct, sexual excitement or sadomasochistic abuse. The legislature expressly has provided that the provision of such materials sometimes is lawful and sometimes is not, *depending on who provides*

---

[2] I also agree with Judge Edmonds that, logically, it only makes sense to ascertain whether a historical exception applies before delving into any overbreadth analysis, because, if a statute is wholly contained within a well-established historical exception, it will be excepted from the overbreadth analysis that, after all, derives from Article I, section 8.

*the material and in what circumstances.* Thus, if a parent, a guardian, a museum, a public library, or—in appropriate circumstances—a retailer provides the material, there is no crime. *See* ORS 167.085. By the terms of the statute, therefore, the harm flows not from the intrinsic nature of the material itself, but from some combination of the material, the identity of the person providing it, and the particular circumstances in which the material is provided. If that is the case, logically it cannot be said that harm *necessarily* flows from distribution of the materials listed in ORS 167.065(1)(a), and, under the analysis prescribed by *Stoneman*, the statute cannot be said to focus on the effects of speech. Thus, even under the majority's analytical framework, it is necessary to determine whether a historical exception applies.

## II.  THE *ROBERTSON* HISTORICAL EXCEPTION ANALYSIS: METHODOLOGY

Historical exception analysis under Article I, section 8, was first required by *Robertson*, in which the Supreme Court explained:

> "Article I, section 8, * * * forbids lawmakers to pass any law 'restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever,' beyond providing a remedy for any person injured by the 'abuse' of this right. This forecloses the enactment of any law written in terms directed to the substance of any 'opinion' or any 'subject' of communication, *unless the scope of the restraint is wholly confined within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 demonstrably were not intended to reach.* Examples are perjury, solicitation or verbal assistance in crime, some forms of theft, forgery and fraud and their contemporary variants."

*Robertson*, 293 Or at 412 (emphasis added; footnote omitted). The analysis thus requires us to answer three questions: (1) Was there a restriction on speech that was well established during the relevant historical period? (2) If so, was Article I, section 8, intended to eliminate that restriction? And (3) if not, does the challenged statute fall "wholly within" that historical exception? *See Moser v. Frohnmayer*, 315 Or

372, 376, 845 P2d 1284 (1993) (describing *Robertson's* historical exception analysis in several steps).

*Robertson* did not provide much in the way of explanation of or rationale for its historical exception analysis. In particular, the court did not explain what it meant by a "well-established" historical exception and what legal principle enables us to distinguish between a merely "established" historical exception as opposed to a *well*-established" one. Nor did the court provide any explanation as to how it arrived at its pronouncement, in *dictum*, that perjury, solicitation, verbal assistance in crime, and other restraints constitute historical exceptions to the protective reach of Article I, section 8. Indeed, the court did not explain whence it derived the historical exception analysis, whether it is a function of the language of the constitution or the intentions of its framers or some other interpretive possibility. In subsequent cases, however, there are clues to be found to flesh out at least some of the unanswered questions left in the wake of *Robertson's* *ipsedixitism*.

To begin with, there is the question of what time period is the appropriate focus of the historical exception analysis. *Robertson* mentions the time "when the first American guarantees of freedom of expression were adopted," referring to the 1790s. In the next phrase, however, it states that we are to determine whether those guarantees "then or in 1859" were intended to reach historically excepted crimes. I must confess that I do not know why the intentions of the framers of the federal constitution are pertinent to the interpretation of Article I, section 8, of the Oregon Constitution. Perhaps sensing that anomaly, the court more recently has stated that the proper focus is more generally "whether the [challenged] restriction was well established when the early American guarantees of freedom of expression were adopted, *i.e.*, by the late eighteenth and mid-nineteenth centuries." *Henry*, 302 Or at 515.[3]

---

[3] In fact, in *Robertson* itself, when the court reiterated the substance of its historical exception analysis, it referred to demonstrating the existence of the exception "when Oregon's Bill of Rights was adopted in 1859," without reference to the framers of the federal constitution 70 years earlier. *Robertson*, 293 Or at 433.

Second, there is the question of what sort of historical evidence is appropriately consulted to determine the extent to which a restriction falls within a historical exception. *Robertson* did not say. But other cases make clear that, at the very least, it is necessary to examine the case law and statutes of other states during the relevant period and the case law and territorial statutes in Oregon at the time of statehood. In *State v. Moyle*, 299 Or 691, 705 P2d 740 (1985), for example, the court addressed the constitutionality of a telephone harassment statute. The court examined an eighteenth-century English statute, contemporaneous English cases, and Blackstone's *Commentaries on the Laws of England. Id.* at 696. The court also surveyed the statutes of American states in effect as of 1859 and paid particular attention to whether Oregon's territorial statutes contained any provisions relevant to the modern one under challenge. *Id.* Similarly, in *Henry*, perhaps the most extensive of the court's historical exception analyses, the court examined English statutes and common-law decisions, the statutes and cases of the American states in existence at the time, and, in particular, Oregon's territorial statutes. *Henry*, 302 Or at 515-23.[4]

Third, there is the question of what the court means by "well established." The meaning of the term is not exactly self-evident. And the Supreme Court has never offered an explanation of its intended definition. I do not take the term to be without meaningful content, however. *Cf.*, William R. Long, *Requiem For* Robertson: *The Life and Death of a Free-Speech Framework in Oregon*, 34 Will L Rev 101, 135 (1998) (a "well-established" historical exception "means whatever the court perceives it to mean" in each case). In particular, I

---

[1] The court did caution, somewhat cryptically, that statutes enacted contemporaneously with the state constitution are "not necessarily [to] be given much weight," because constitutional drafters "are concerned with broad principles of long-range significance." *Henry*, 302 Or at 521-22. I take it that the operative term is "not necessarily"; that is to say, the existence of a historical statute will not necessarily establish a historical exception. I do not understand the court to say that consideration of such statutes is not relevant or important. Indeed, in *Henry*, immediately following the quoted statement, the court proceeded directly to analyze in some depth the effect of an Oregon territorial statute to determine the extent to which it revealed evidence of a historical exception. *Id.* at 522-23.

do not understand the term to require that a historical exception has been in existence a certain minimum number of centuries or has been adopted by a certain minimum number of states or been reflected in a certain minimum number of reported cases.

I suggest instead that what constitutes a "well established" exception must be defined in terms of the object of the historical exception analysis. As I understand it, the object of the *Robertson* historical exception analysis is to ascertain the intentions of the framers of the Oregon Constitution. *See Robertson*, 293 Or at 412 (characterizing the ultimate objective of historical exception analysis as determining whether the guarantees of freedom of expression "demonstrably *were not intended* to reach" previously well-established forms of state regulation (emphasis added)); *see also Henry*, 302 Or at 521 (emphasizing the importance of demonstrating "that the guarantees of freedom of expression *were not intended* to replace the earlier restrictions" (emphasis added)). Unfortunately, the framers left little in the way of a historical record of what they intended by enacting the free speech protections described in Article I, section 8. In the absence of such evidence, we are forced to rely on more general evidence of the law that existed at the time. There are always risks associated with inferring from that general historical record any specific intentions of the Oregon framers. To minimize those risks, the Supreme Court apparently desires that an asserted historical exception be "well established" in the law of the relevant period before drawing any inferences from the historical record as to the intentions of the Oregon framers.

In *Moyle*, for example, the court examined the historical record pertaining to the regulation of harassment both in England and in early nineteenth-century America to determine whether such regulation constituted a historical exception. The court noted that, although the English Waltham Black Act of 1723, made it a capital offense to, among other things, send unsigned or fictitiously signed letters threatening to commit a crime, that statute was repealed in 1823. *Moyle*, 299 Or at 696. Moreover, the court noted, although by 1859 seven American states had statutes in effect prohibiting nonextortionate written threats to commit

various felonies, Oregon did not. Oregon did have a territorial statute that prohibited sending or delivering threatening letters, but the statute was replaced in 1853 with a statute that prohibited only extortionate threats. "Thus," the court held, "when the Oregon Constitution was adopted in 1859, Oregon had no statute prohibiting non-extortionate written threats." *Id.* Thus, in *Moyle*, the court's focus was on the quality of the historical record as a basis for drawing inferences *about the intentions of the framers of the Oregon Constitution.* It did not examine the record to determine the extent to which the proposed historical exception had been "on the books" for an arbitrary minimum period of time or had been in existence for a requisite number of centuries.

Finally, there is the question of what sort of "restraint" may constitute a historical exception. *Robertson* listed several possibilities as examples: "perjury, solicitation or verbal assistance in crime, some forms of theft, forgery, and fraud and their contemporary variants." 293 Or at 412. I understand the list to be indicative and not exhaustive. After all, *Robertson* itself characterized the list as "[e]xamples" only. *Id.* Subsequent decisions in which the Supreme Court has examined restraints not included in the list enumerated in *Robertson* bear out the point. *See, e.g., Moser,* 315 Or at 376-78 (telemarketing solicitation); *Henry,* 302 Or at 515-23 (obscenity); *Moyle,* 299 Or at 696 (harassment).

Moreover, I do not take the list itself to suggest any limitations on the nature of the restraints that may constitute historical exceptions to the reach of Article I, section 8. I have seen it suggested, for example, that only crimes—indeed, only "conventional" crimes—may constitute a historical exception to the protections of Article I, section 8. Nothing in *Robertson* says that, however.[5] We addressed that very point in *Smallwood v. Fisk,* 146 Or App 695, 934 P2d 557 (1997). In that case, we upheld an award of punitive damages

---

[5] After describing the historical exception analysis generally, *Robertson* later reiterated that Article I, section 8, was not meant to immunize all speech from state regulation in all respects. *As an example* of regulation not prohibited by Article I, section 8, the court noted: *"[O]ne of these* is the use of words in the course of what indisputably would have been a conventional crime when Oregon's Bill of Rights was adopted in 1859." *Robertson,* 293 Or at 433 (emphasis added).

for fraud in a civil case against an Article I, section 8, challenge. We reasoned that Article I, section 8, did not prohibit an award of punitive damages for fraud because there existed a well-established historical exception—shown by 1855 and 1864 Oregon statutes on the subject—permitting an award of punitive damages for fraud. In response to the argument that the historical exception analysis does not apply to civil fraud, we explained:

> "It conceptually makes no sense to say that certain speech was intended by the founders to be exempt from Article I, section 8, for criminal purposes but not for others. It is tantamount to saying that the founders intended to allow people to be jailed for their fraud but not to be fined for the same conduct."

*Id.* at 702. We also noted that the Supreme Court likewise has commented that " '[t]he nature of the prohibition, either civil or criminal, is immaterial' to the prohibition against restrictions on free speech." *Id.* (quoting *City of Hillsboro v. Purcell*, 306 Or 547, 553, 761 P2d 510 (1988)).

In short, then, the historical exception analysis requires courts to determine whether there existed a regulation of speech during the period from the late eighteenth to the mid-nineteenth centuries that was sufficiently well established to allow us to infer that the framers of the Oregon Constitution would have been aware of it, whether there is any evidence that the framers intended Article I, section 8, to abrogate it, and whether the modern statute—in this case ORS 167.065(1)(a)—is wholly contained within that "historical exception."

## III. THE *ROBERTSON* HISTORICAL EXCEPTION ANALYSIS: APPLICATION

### A. *The Existence of a "Well-Established" Historical Exception*

With the foregoing principles in mind, I turn to the historical record concerning government regulation of the distribution of obscene materials to children. I begin with the observation that governmental regulation of speech is a centuries-old phenomenon, particularly when the prohibited speech is deemed dangerous to the morals of children. To be

sure, for as long as there has been such regulation, its wisdom has been debated. But the *authority* of government to impose it has been unquestioned until the early years of this century. *See generally* Charles Rembar, *The End of Obscenity*, 11 (1968) ("Censorship is old, as old as history. \* \* \* Until recently there was no contest: almost nothing that seriously offended certain prevailing concepts of morality and decency was allowed to be published.").

### 1.  *Regulation of obscenity in England.*

The regulation of speech dates back at least to the ancient Greeks. *See* Martha Alshuler, *Origins of the Law of Obscenity, in* 2 Technical Report of the Commission on Obscenity and Pornography 65 (1971) (censorship of literary publications dates at least to Greek and Roman times). Plato suggested that poets should be banished from his ideal republic because they taught false ideas that would corrupt the morals of youth. Plato, *Republic II, in* 1 *Dialogues of Plato*, 641 (B. Jowett trans., 1937) ("the first thing will be to establish a censorship of the writers of fiction, and let the censors receive any tale of fiction which is good, and reject the bad; and we will desire mothers and nurses to tell their children the authorized ones only"). Indeed, Socrates was killed not merely for his atheism but because he was "a doer of evil, who corrupts the youth" with his teachings. Plato, *Apology, in* 1 *Dialogues of Plato*, 407 (B. Jowett trans., 1937).

The roots of the modern regulation of obscenity, however, lay in the more recent history of English and American law. With the introduction of printing to England in the fifteenth century came royal censorship through a licensing system operated by the Star Chamber and the Stationers Company. *See generally*, W.S. Holdsworth, *Press Control and Copyright in the 16th and 17th Centuries*, 29 Yale LJ 841 (1921). The early focus of the censors was sedition and heresy, not obscenity, not because the crown lacked the authority to impose such restrictions, but because it was regarded as the domain of ecclesiastical courts. But with the rise of Puritanism in the late sixteenth century came increased attention to the regulation of bawdy books and plays; censorship was no longer limited to works of seditious or heretical

nature. Especially during the Commonwealth period, censorship of all sorts was particularly rigorous. *See generally* Alshuler, *Origins of the Law of Obscenity* at 66.

With the Restoration in 1660 came a reaction to repressive Puritanism. Religious energies flagged, and a more secularized—if not licentious—world view became increasingly predominant. 3 *Oxford History of Britain*, 138-42 (Kenneth O. Morgan ed., 1992); Norman St. John-Stevas, *Obscenity and the Law*, 15 (1956). Censorship of books returned to its original, more limited purposes. It was in that context that what is commonly regarded as the first reported judicial decision on obscenity arose.

In 1663, Sir Charles Sedley, an "intimate of King Charles II 'as famous for his wit as he was for the profligacy of his life,' " Leo M. Alpert, *Judicial Censorship of Obscene Literature*, 52 Harv L Rev 40, 41 (quoting 8 *Cambridge History of English Literature*, 158 (1912)), engaged in a drinking spree at "The Cock," a local tavern. He and two companions became drunk, stripped off their clothes, climbed a balcony overlooking Covent Garden and hurled both profanities and bottles filled with an "offensive liquor,"—that is, urine—at the public below. A minor riot ensued, ultimately resulting in the arrest and prosecution of Sedley:

> "He was fined 2000 mark, committed without bail for a week, and bound to his good behavior for a year, on his confession of information against him, for shewing himself naked on a balcony, and throwing down bottles (pist in) vi & armis among the people in Covent Garden, contra pacem and to the scandal of the Government."

*Le Roy v. Sr. Charles Sedley*, 83 Eng Rep 1146 (1663).[6]

Meanwhile, the sixteenth-century legislation requiring the licensing of publications expired in 1695. Parliament declined to reauthorize the legislation, mainly because the large number of printers, the spread of literacy, and the increasing public demand for literature made the enforcement of the law impossible. With the loosening of publication controls, writers saw the publication of obscenity as a means

---

[6] Laurence Tribe comments that Sedley thus became the first adjudicated "streaker." Laurence Tribe, *American Constitutional Law*, 657 (1978).

of making a quick pound. Religious leaders and members of the upper classes became concerned about the possible adverse effects on public morality. Thus was the stage set for further control of obscenity by the courts. *See* Alschuler, *Origins of the Law of Obscenity* at 67.

At first—and notwithstanding *Sedley*—the courts were reluctant. In 1708, in *Queen v. Read*, 88 Eng Rep 953 (1708), the author of *The Fifteen Plagues of a Maidenhead* was charged with obscenity. The court held that, if the publication of the book was punishable, it was in the "Spiritual Court," that is, in the ecclesiastical courts. Not long after, however, in *Rex v. Curl*, 93 Eng Rep 849 (1727), the court overruled *Read* and, citing *Sedley* as precedent, held that the author of *Venus in the Cloister or the Nun in Her Smock* was subject to indictment for a common-law crime of obscenity. The court reasoned that, although obscenity traditionally was thought to be an offense against religion, morality and religion were legitimate subjects of concern at common law: "Now morality is a fundamental part of religion and therefore whatever strikes against that, must for the same reason be an offence against the common law." *Id.*; *see also 4 Blackstone's Commentaries on the Law of England*, 64 (Wendell ed 1859) ("lewdness" and "public indecency" are indictable offenses at common law to protect public morality).

A handful of other obscenity cases have been reported in the late eighteenth and early nineteenth centuries. Most held that obscenity is indeed an indictable offense at common law, but because it was regarded as antireligious. *E.g., King v. Gallard*, 25 Eng Rep 547 (1733) (upholding prosecution for "running in the common way, naked down to the waist, the defendant being a woman"); *Rex v. Wilkes*, 98 Eng Rep 327 (1770) (upholding prosecution for obscenity and "impious libel" for publication of erotic poetry). Such was not always the case, however. In *Rex v. Crunden*, 170 Eng Rep 1091 (1809), for example, the court upheld a prosecution for bathing nude in the sight of homes, without reference to whether the practice was an offense against religion.[7]

---

[7] The court ultimately ordered the defendant discharged, because the case represented "the first prosecution of this sort in modern times."

By the beginning of the nineteenth century, the crime of obscenity had become firmly established. *See generally* Frederick F. Schauer, *The Law of Obscenity*, 6 (1976) ("[B]y the beginning of the 19th century, however, the common-law crime of obscene libel had matured and was used against works which were purely sexual in content, without the necessity of political or religious implications."). In the first half of the nineteenth century, there were approximately 160 obscenity prosecutions in England, not an insubstantial figure. St. John-Stevas, *Obscenity and the Law* at 66. During that period, Parliament also entered the fray. In 1824, it enacted the Vagrancy Act, 5 Geo 4, c. 83, which forbade displaying an obscene book or print in a public place. In 1853, came the Customs Consolidation Act, 16 & 17 Vict, c. 107, which banned the importation of "[i]ndecent or obscene prints, paintings, books, cards, lithographic or other engravings, or any other indecent or obscene articles." And in 1857, Parliament passed the landmark Campbell Act, 20 & 21 Vict, c. 83 (1857). The act did not create a new offense, but rather authorized the destruction of obscene books and prints and empowered magistrates to issue warrants to search premises suspected of holding such materials for sale. Interestingly, Lord Campbell's principal justification for the enactment was not the antireligious nature of obscenity, but its potential to "corrupt[ ] the morals of youth." Alpert, *Censorship of Obscene Literature*, 52 Harv L Rev at 51 n 29 (citing 146 *Hansard Parliamentary Debates*, 327 (1857)).

### 2. *Regulation of obscenity in America.*

In early colonial America, the regulation of obscenity did not generate much interest. That is perhaps not surprising. Early colonists lived hard lives characterized by much physical labor and little leisure time, and had little access to nonbiblical literary works of any sort, much less those that would arouse controversy. That is not to say that early colonial America was an Eden of free expression. In Puritan Massachusetts, in particular, speech was heavily regulated. The colony established a general censorship system that, among other things, permitted only one person to have a printing press in the entire city of Boston. Punishment was severe; until 1697 blasphemy was a capital offense, and after that could be punished by boring the blasphemer's tongue with a

hot iron. Thomas G. Barnes ed., *The Book of the General Lawes and Libertyes Concerning the Inhabitants of the Massachusets*, 5 (1648).

As the colonists became more prosperous, they acquired both the time and the means to acquire leisure goods from England. This was, it should be recalled, during the time that England produced Sir Charles Sedley and the *Fifteen Plagues of a Maidenhead*. Massachusetts reacted with the enactment of the first American obscenity statute in 1711:

> "Whereas evil communications, wicked, profane, impure, filthy and obscene songs, composures, writings or prints do corrupt the mind, and are incentives to all manner of impieties and debaucheries, more especially digested, composed or uttered in imitation or in mimicking of preaching, or any other part of divine worship, every person or persons offending in any of the particulars aforementioned shall be punished by fine to Her Majesty not exceeding twenty pounds or by standing on the pillory once or oftener, with an inscription of his crime in capital letters affixed over his head, according to the discretion of the justice in quarter sessions."

Ancient Charter, Colony Laws and Province Laws of Massachusetts Bay (1814), *cited in* Alschuler, *Origins of the Law of Obscenity* at 74. Interestingly, that statute predated England's *Curl* decision by more than a decade. *See* Alschuler, *Origins of the Law of Obscenity* at 75 ("Massachusetts had by statute made obscenity a crime 16 years before England found it an offense at common law, and the Massachusetts offense was more separate from religion than the English offense created in 1727.").

Other colonies did not follow suit. They did enact statutes regulating profanity or blasphemy, but not obscenity. The reasons for, and the significance of, the failure of other prerevolutionary colonies to enact statutes criminalizing obscenity have been debated. Some have suggested that the colonists thought that the English common law, which by 1727 had recognized the offense of obscene libel, sufficed. Others have suggested that the colonists thought that the regulation of obscenity was a matter of religious, not secular governmental, concern. *See generally* Morris L. Ernst & Alan

U. Schwartz, *Censorship: The Search for the Obscene*, 9-10 (1968); Alschuler, *Origins of the Law of Obscenity* at 75.

But the fact that colonists chose not to regulate obscenity does not mean that they thought the matter beyond the authority of the state to regulate. That much is made certain by the fact that, during the critical period of the first half of the nineteenth century, the states exercised that authority to such an extent that by the middle of the century "the production and distribution of obscene materials was a crime throughout much of the United States." United States Department of Justice, Attorney General's Commission on Pornography, 1 *Final Report*, 243 (1986); *see also* Daniel Barnhart, *The Oregon Bill of Rights and Obscenity: How Jurisprudence Confounded Constitutional History*, Comment, 70 Or L Rev 907, 938-39 (1991) ("By 1860, most of the 33 states had enacted statutes restricting the publication or distribution of obscenity.").

Precisely what precipitated this legislation is not certain, but the prevailing view seems to be that it coincided with the creation of public schools and a concern for the proper education of children. As one leading authority explains:

> "[T]he new interest in legal control of obscenity coincided with a steady increase in literacy. The first public high school in the United States opened in 1820. There was as yet no compulsory education, but the move for free universal education was gaining steady support. State antiobscenity statutes typically emphasized a purpose of protecting youth."

Alschuler, *Origins of the Law of Obscenity* at 76. Lawrence Friedman offers a similar explanation of the new nineteenth-century interest in the regulation of obscenity and vice:

> "This was another reason why vice laws needed to be passed, even if such laws were hard to enforce. Illegal vice would have to hide its face, and young folks would be less likely to come within its orbit of corruption. Obscenity laws, for example, were aimed at words and pictures that might 'corrupt' the 'morals of youth.' "

Lawrence M. Friedman, *Crime and Punishment in American History*, 131 (1993); *see also* Morris L. Ernst & Alan U.

Schwartz, *The Search for the Obscene* at 18-19 ("By this time [the early nineteenth century] the agitation for universal, free, compulsory elementary education was making great strides, and the fear of literacy was obviously linked to the legal moves against obscenity.").

The concern for the protection of youth from the potential ravages of obscenity already had found expression in judicial opinions recognizing the crime of obscene libel at common law. The Pennsylvania Supreme Court's decision in *Commonwealth v. Sharpless*, 2 Serg & Rawle 91 (Pa 1815), is perhaps the best-known example. In that case, the defendant was indicted for exhibiting a painting that depicted "a man in obscene, impudent and indecent posture with a woman." The defendant argued that privately showing the picture was not an indictable offense, particularly because he had shown the picture in a private room. The court upheld the indictment. Writing in the *seriatim* format of the day, the Chief Judge explained that merely because the defendant showed the painting in a private room did not save him from prosecution:

> "The law is not to be evaded by an artifice of that kind; if the privacy of the room was a protection, all the youth of the city might be corrupted, by taking them, one by one, into a chamber, and then inflaming their passions by the exhibition of lascivious pictures."

*Id.* at 102. In a separate opinion, Justice Yeates further explained that:

> "The corruption of the public mind, in general, *and debauching the manners of youth, in particular,* by lewd and obscene pictures exhibited to view, must necessarily be attended with the most injurious consequences, and in such instances, courts of justice are, or ought to be, the schools of morals."

*Id.* at 103 (emphasis added). In each case, the focus of concern was the protection of children from the effects of exposure to the obscene material.

The Massachusetts Supreme Court's 1821 decision in *Commonwealth v. Holmes*, 17 Mass 336 (1821), supplies another example. In that case, the court upheld the conviction of the publisher of *Memoirs of a Woman of Pleasure* for

publishing a "lewd and obscene print" that was contained in the book. According to the indictment, the publisher was guilty of being

> "a scandalous and evil-disposed person, and contriving, devising and intending the morals as well of youth as of other good citizens of said commonwealth to debauch and corrupt and to raise and create in their minds inordinate and lustful desires."

*Id.* at 336.

The concern for the morals of children frequently was stated explicitly in early nineteenth-century obscenity statutes. The 1835 Massachusetts obscenity law is typical. It provided:

> "If any person shall import, print, publish, sell or distribute any book, or any pamphlet, ballad, printed paper, or other thing, containing obscene language, or obscene prints, pictures, figures, or descriptions, *manifestly tending to the corruption of the morals of youth, or shall introduce into any family, school, or place of education*, or shall buy, procure, receive or have in his possession, any such book, pamphlet, ballad, printed paper or other thing, either for the purpose of sale, exhibition, loan, or circulation, or with intent to introduce the same into any family, school or place of education, he shall be punished by imprisonment in the county jail, not more than two years, and a fine not exceeding one thousand dollars."

Mass Rev Stat, ch 130, § 10 (1836) (emphasis added). The State of Michigan enacted a similar statute in 1846, prohibiting the distribution of obscene materials "tending to the corruption of the morals of youth." Mich Rev Stat, Title XXX, ch 158, § 13 (1846). So also did the State of Virginia, Va Stat, ch 196, § 11 (1849) (prohibiting the distribution of obscene materials "manifestly tending to corrupt the morals of youth"); the State of Wisconsin, Wis Rev Stat, ch 139, § 11 (1849) (prohibiting distribution of obscene material "manifestly tending to the corruption of the morals of youth"); the State of Iowa, Iowa Code, Title 23d, ch 145, § 2717 (1851) (prohibiting distribution of obscene material "manifestly tending to corrupt the morals of youth"); the State of Maine, Main Rev Stat, ch 124, § 13 (1857) (prohibiting distribution of obscene materials "manifestly tending to corrupt the morals of youth"); the

State of Rhode Island, RI Stat, Title XXX, ch 216, § 12 (1857) (prohibiting the distribution of obscene materials "manifestly tending to the corruption of the morals of youth"); the State of Tennessee, Tenn Code, Art II, § 4847 (1858) (prohibiting distribution of obscene materials "into any family, school or place of education"); the State of Minnesota, Minn Pub Stat, ch 96, § 11 (1859) (prohibiting the distribution of obscene materials "manifestly tending to the corruption of the morals of youth"); and the State of Texas, Tex Penal Code, § 399 (1859) (prohibiting the publication of obscene materials "manifestly designed to corrupt the morals of youth").

Other states enacted even broader obscenity statutes, not limited to the protection of the morals of youth. In 1821, for example the State of Vermont made it a crime punishable by a $200 fine to "print, publish, or vend any lewd or obscene book or print." Vt Laws of 1821, § 23. The State of Connecticut similarly outlawed the importation, printing, publication, sale or distribution of "any book, pamphlet, ballad or other printed paper, containing obscene language, prints or descriptions." Conn Stat, Title 21, § 82 (1835). New Hampshire enacted a statute providing that no person may "sing or repeat, or cause to be sung or repeated any lewd, obscene or profane song, or shall repeat any lewd, obscene or profane word, or write or mark in any manner any obscene or profane word, or obscene or lascivious figure" on public buildings, fences, walls and the like. NH Rev Stat, ch 113, § 2 (1843). Illinois prohibited the importation or sale of "any obscene book, pamphlet or print." Ill Rev Stat, ch 30, § 128 (1845). Indiana likewise made punishable by a $500 fine the sale, exhibition or circulation of "any obscene book, pamphlet or picture" and added to the punishment a period of up to three months in jail "if the exhibition be made to a female." Ind Rev Stat, ch 8, § 52 (1852). Arkansas prohibited any person from making "any obscene exhibition of his person" or "exhibiting any obscene or indecent pictures, or figures." Stat Ark, ch 51, Art VII, §§ 1, 2 (1856). California prohibited any person from publishing, selling, or exhibiting "any lewd or obscene book, pamphlet, picture, print card, paper or writing." Cal Laws, ch 271, § 1 (1859).

The federal government, too, enacted legislation directed at limiting the distribution of obscene materials. In

1842, Congress enacted a law prohibiting the importation of "all indecent and obscene prints, paintings, lithographs, engravings and transparencies," 5 Stat 566 (1842), generally assumed to have been directed at the "French postcard trade" in depictions of nude women. Schauer, *The Law of Obscenity* at 10; Alschuler, *Origins of the Law of Obscenity* at 77. Congress amended the law in 1857 to include indecent and obscene articles and other printed materials. 11 Stat 168 (1857).

Thus, in the first half of the nineteenth century, both the states and Congress openly assumed their authority to regulate obscenity. *See* Lawrence M. Friedman, *Crime and Punishment in American History* at 350 ("In the nineteenth century, it was taken for granted that states and cities could put pornography under the ban and punish people who made it or sold it."). I have searched the reported cases in vain for a single decision in which the authority of the federal, state, or local governments to regulate obscenity was not upheld. Indeed, it is difficult to find a decision in which such authority was challenged at all, much less on constitutional grounds. In one 1838 case, a defendant to a Massachusetts obscenity prosecution suggested that the state lacked authority to regulate obscene libel and blasphemy. The court's response is revealing:

> "It seems now to be somewhat late to call in question the constitutionality of a law, which has been enacted more than half a century, which has been repeatedly enforced, and the validity of which, it is believed, until this prosecution, has never been doubted, though there have been many prosecutions and convictions under it."

*Commonwealth v. Kneeland*, 37 Mass 206, 217 (1838).

Oregon's pioneers apparently shared those convictions. In 1853, following the famed battle of the Iowa "blue books," the Territorial Legislature authorized the drafting of a new, "full and complete" territorial code. The drafting responsibilities fell to a commission headed by James K. Kelly. The common practice in western territories was to borrow from existing statutes in other states. *See generally* Lawrence M. Friedman, *A History of American Law*, 139 (1973) (observing that "many territorial statutes were the

product of scissors and paste"). Kelly's Commission followed that tradition, drawing heavily from the revised statutes of New York, enacted in 1829, 1836, 1848, and 1852. Interestingly, New York was one of the few states before the Civil War that had not yet enacted an obscenity statute.[8] The Kelly Commission nevertheless adopted an obscenity provision, borrowing from the Iowa Code instead, altering only some punctuation and lowering the penalty:

> "If any person shall import, print, publish, sell or distribute any book or any pamphlet, ballad, printed paper or other thing containing obscene language or obscene prints, pictures, figures, or other descriptions, manifestly tending to the corruption of the morals of youth, or shall introduce into any family, school or place of education, or shall buy, procure, receive, or have in his possession, any such book, pamphlet, ballad, printed paper or other thing, either for the purpose of loan, sale, exhibition or circulation, or with the intent to introduce the same into any family, school, or place of education, he shall, on conviction, be punished by imprisonment in the county jail not more than six nor less than three months, or by a fine not more than three hundred, nor less than fifty dollars."

Or Stat, ch 11, § 10 (1853).

At least two things bear emphasis with respect to the 1853 territorial statute. First, the obscenity provision did not slip in accidentally in the process of incorporating other provisions of the statutes of other jurisdictions. It is plain that the Kelly Commission and the Territorial Legislature made a conscious decision to enact an obscenity statute and to join the majority of other states that had done so to date. Second, the particular statute that it enacted was borrowed from those with a narrower focus on protecting the morals of children. That, too, cannot have been accidental. Other models existed that more broadly condemned obscenity generally. Oregon's territorial statute prohibited the distribution of obscene materials "manifestly tending to the corruption of youth."

---

[8] Shortly after the Civil War, in 1868, New York adopted an antiobscenity statute. 7 NY Stats 309 (1868).

To be sure, neither Oregon's nor any other state's obscenity statute defined the term "obscene." The courts of the day expressed concern—with a quaintness that is perhaps odd to modern sensibilities—for "the chastity of our records." *Sharpless*, 2 Serg & Rawle at 103; *see also State v. Appling*, 25 Mo 315, 317 (1857) ("Our respect for the chastity of the records of our court will not suffer the outrageously vulgar words that were spoken and sung by the defendant in this case."); *State v. Brown*, 27 Vt 619, 619 (1855) ("if the publication be of so gross a character that spreading it upon the record will be an offence against decency, it may be excused"); *People v. Girardin*, 1 Mich 90, 91 (1848) ("Courts will never allow its records to be polluted by bawdy and obscene matters."). But the nature of the obscenity that was at issue in these cases cannot be mistaken: It was invariably nudity and depictions of sex.

In *Sharpless*, for example, the defendant was charged with showing a painting of "a man in obscene, impudent and indecent posture with a woman." 2 Serg & Rawle at 91-2. The court expressed concern that the painting would arouse lustful feelings. There can be no doubt about what the man and the woman in the picture were doing. Similarly, in *Barker v. Commonwealth*, 19 Pa 412, 413 (1852), the defendant was indicted for publicly describing "men and women in obscene and indecent positions * * * with intention 'to debauch, debase and corrupt the morals of youth.'" Obviously, what the defendant had been describing was sex. In *Bell v. State*, 31 Tenn (1 Swan) 42 (1851), the defendant was convicted of "the utterance of certain grossly obscene words, in public." The "grossly obscene" utterance was that the defendant had described "acts of criminal intercourse" with the daughters of a local citizen. *Id.* at 43. In *Commonwealth v. Tarbox*, 55 Mass (1 Cush) 66, 67 (1848), the defendant was charged with the publication of obscene materials, which included an advertisement for an "instrument for * * * the prevention of conception."

Indeed, numerous cases demonstrate prosecutions for obscene behavior based on public nudity alone. In *State v. Roper*, 18 NC 208 (1835), for example, the defendant was charged with indecent exposure. The court held that "[a] public exposure of the naked person is among the most offensive of those outrages on decency and public morality." *Id.* at 209.

Similarly, in *Britain v. State*, 22 Tenn (3 Humph) 203, 204 (1842), the defendant was convicted of "lewdness" for "permitting his slaves to go about the country in a state of nakedness." *See also State v. Hazle*, 20 Ark 156 (1859) (public nudity); *Miller v. People*, 5 Barb 203 (NY Sup Ct 1849) (public nudity); *McJunkin v. State*, 10 Ind 140, 145 (1858) (although "public indecency" is a vague term, it certainly includes "public displays of the naked person, the publication, sale or exhibition of obscene books and prints * * * acts which have a direct bearing on public morals, and affect the body of society").

In my view, the foregoing historical materials leave no room for doubt that, by 1859, it was "well established" that distributing obscene materials to children was not constitutionally protected speech, that, to the contrary, imposing criminal penalties for such conduct was widely assumed to be—indeed, adjudicated to be—the legitimate prerogative of the state and federal governments. At English common law, obscene libel had been a crime for nearly two centuries and had been the subject of parliamentary prohibition. In America, where the states absorbed the English common law into the fabric of their distinct legal traditions, the courts followed suit, emphasizing the importance of protecting the morals of children. The legislative assemblies of the states did likewise, enacting numerous statutes criminalizing the distribution of obscene materials tending to corrupt the morals of youth.

It has been noted that, although there existed a substantial body of law authorizing the punishment of the distribution of obscene materials, those laws frequently were not enforced. *See, e.g.*, Frederick F. Schauer, *The Law of Obscenity* at 10 ("The years prior to the Civil War witnessed a proliferation of obscenity and lewdness statutes, but there were still few prosecutions."). In fact, the historical record shows that, in the period from the late eighteenth to the mid-nineteenth centuries, quite a bit of literature that would have been considered bawdy, lewd, or obscene was in wide circulation.[9] But all that is beside the point for at least two

---

[9] Perhaps the most familiar summary of such literature is Justice Douglas's, in his dissenting opinion in *United States v. 12 200-Ft Reels*, 413 US 123, 93 S Ct 2665, 37 L Ed 2d 500 (1973), in which he observed that the four decades before the enactment of the First Amendment

" 'saw the publication, virtually without molestation from any authority, of two classics of pornographic literature.' D. Loth, The Erotic in Literature 108

reasons. First, the fact that early nineteenth-century *adult* settlers easily could get their hands on a copy of *Tom Jones* says nothing about pioneer concerns for the morals *of children,* particularly with the advent of compulsory public education in the early nineteenth century. Second, as in the case of the infrequent enforcement of colonial censorship laws, the fact that nineteenth-century obscene libel laws were not vigorously enforced establishes nothing about the *authority* of the states to enforce them. It is clear to me that, based on the case law that existed as of 1859 and the legislation that had been enacted to that date that no one seriously questioned the *authority* of the states in that regard.

B.  *Whether Article I, Section 8, Was Intended to Eliminate the Regulation of Distributing Obscene Materials to Children*

Nothing in the language of Article I, section 8, or its history suggests that it was intended to abrogate the established authority of the state to punish the distribution of obscene materials to children. The constitution provides:

> "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

To be sure, the opening clause of Article I, section 8, is absolute: "No law shall be passed * * *." But the balance of the section cannot be ignored. It provides that, notwithstanding

(1961). In addition to William King's The Toast, there was John Cleland's Memoirs of a Woman of Pleasure, which has been described as the 'most important work of genuine pornography that has been published in English * * *" L. Markun, Mrs. Grundy 191 (1930). In England, Harris' List of Covent Garden Ladies, a catalog used by prostitutes to advertise their trade, enjoyed open circulation. N. St. John-Stevas, Obscenity and the Law 25 (1956). Bibliographies of pornographic literature list countless erotic works which were published in this time. See, *e.g.*, A. Craig, Suppressed Books (1963); P. Fraxi, Catena Librorum Tacendorum (1885); W. Gallichan, The Poison of Prudery (1929); D. Loth, *supra*; L. Markun, *supra*. This was the age when Benjamin Franklin wrote his 'Advice to a Young Man on Choosing a Mistress' and 'A Letter to the Royal Academy at Brussels.' 'When the United States became a nation, none of the fathers of the country were any more concerned than Franklin with the question of pornography. John Quincy Adams had a strongly puritanical bent for a man of his literary interests, and even he wrote of Tom Jones that it was 'one of the best novels in the language.' " Loth, *supra*, at 120."

*Id.* at 132-33 (footnote omitted).

the absolute prohibition of the first clause, "every person shall be responsible for the abuse of this right." Apparently, the framers of the Oregon Constitution wanted to leave room for the state to regulate the "abuse" of the right of free speech.[10] The question, of course, is whether the framers intended the absolute prohibition of the first clause of Article I, section 8, to eliminate any room for the state to regulate the distribution of obscene materials to children or whether they understood that such regulation fell within the legitimate regulation of the abuse of free speech rights.

I can find no evidence that the framers of the Oregon Constitution intended to constrain the authority of the state to regulate the distribution of obscene materials to children. Nothing in the available records of the 1857 Constitutional Convention remotely suggests even the possibility that the framers intended the adoption of the Oregon Constitution to have that effect.

What I do find in the historical record is the fact that, shortly after the adoption of the constitution, the Oregon Legislature re-enacted the 1853 territorial obscenity statute as part of the state's first criminal code. General Laws of Oregon, ch 48, § 637 (Deady 1845-64). What is more, the compiler of that code, Matthew P. Deady, was one of the principal drafters of the constitution and the President of the Constitutional Convention. The notion that the framers intended to preclude the state from regulating the distribution of obscene material to children is difficult to square with that historical fact.

Such a notion also is difficult to square with the development of free expression generally. No one seriously suggested that a state or federal government lacked the constitutional authority to regulate the distribution of obscene materials generally, much less to children, until the early twentieth century. *See, generally,* Bradley C. Bobertz, *The Brandeis Gambit: The Making of America's "First Freedom," 1909-31,* William & Mary L Rev 557, 559 (1999) ("At the end of the nineteenth century, the most remarkable aspect of our

---

[10] The abuse clause, in fact, is the only plausible textual basis for *Robertson's* historical exception analysis. Thus, the "exception" is from the categorical prohibition of the first clause of Article I, section 8, not the section as a whole.

'first freedom' was that practically no one talked about it, wrote about it, or sued to enforce it * * *."); G. Edward White, *The First Amendment Comes of Age: The Emergence of Free Speech in Twentieth Century America*, 95 Mich L Rev 299 (1996) (tracing origins of new conceptions of free speech in early twentieth century); David M. Rabban, *The Free Speech League, the ACLU, and the Changing Conceptions of Free Speech in American History*, 45 Stan L Rev 47 (1992) (tracing modern libertarian free speech theory to, among other things, a turn-of-the-century reaction to the Comstock Act). To the contrary, following the Civil War, the regulation of obscenity became even more intensive, as other states enacted obscenity laws, *see, e.g.,* Maryland Code, Art 30, § 78 (1860) (prohibiting publication of "obscene or licentious matter"); 7 NY Stats 309 (1868) (prohibiting publication of "obscene" material); NJ Laws, ch 536, § 1 (1868) (prohibiting the distribution of "obscene" materials); 1872 Ohio Laws 174-75 (prohibiting distribution of "any obscene, lewd and lascivious" materials); La Stat Ann § 2088 (1884) (prohibiting distribution of "indecent or obscene" materials "tending to debauch the morals"); SC Laws, No. 181, § 1 (1885) (prohibiting obscene matter "manifestly tending to the corruption of the morals of youth"), and as those who already had enacted them began to enforce them with Victorian vengeance, *see, e.g., State v. Doty*, 103 Iowa 699, 73 NW 352 (1897); *People v. Kaufman*, 12 NY Crim R 263, 14 App Div 305, 43 NYS 1046 (1897); *State v. Holedger*, 15 Wash 443, 46 P 652 (1896); *Commonwealth v. McCance*, 164 Mass 162, 41 NE 133 (1895); *Smith v. State*; 24 Tex App 1, 5 SW 510 (1887); *Larison v. State*, 49 NJL 256, 9 A 700 (NJ Sup 1887); *Thomas v. State*, 103 Ind 419, 2 NE 808 (1885); *O'Brien v. State*, 37 Ohio St 113 (1881); *Fuller v. People*, 92 Ill 182 (1879); *People v. Justices of Special Sessions*, 17 NY Sup Ct 224 (1877). Oregon, in fact, was among the states that continued to enforce its obscenity statute. *State v. Andrews*, 35 Or 388, 58 P 765 (1899), *overruled on other grounds State v. McDonald*, 231 Or 24, 361 P2d 1001 (1961).[11]

---

[11] The court ultimately reversed the convictions but did not question the validity of the law. In fact, the court noted that the exhibition of obscene pictures was both a crime at common law and prohibited by statute. *Andrews*, 35 Or at 393.

Congress, too, stepped up its regulation of obscene materials in response to pressure from the public generally and from Anthony Comstock's New York Society for the Suppression of Vice particularly. The resulting Comstock Act of 1873, 18 USC § 1461, prohibited the sending of obscene material through the mail. *See generally* Schauer, *The Law of Obscenity* at 12-15.

Once again, the authority of the state and federal governments to engage in this concerted enforcement activity was taken for granted. There was a challenge to the authority of Congress to enact the Comstock Act. It was, however, given short shrift. In *Ex Parte Jackson*, 96 US 727, 24 L Ed 877 (1877), the United States Supreme Court treated the argument thusly:

> "All that Congress meant by this act was, that the mail should not be used to transport such corrupting publications and articles, and that any one who attempted to use it for that purpose should be punished. * * * The only question for our determination relates to the constitutionality of the act; and of that we have no doubt."

*Id.* at 736-37.

To suggest that Oregon's framers understood that the effect of enacting Article I, section 8, was to extend constitutional protection to the distribution of obscene materials to children is to ascribe to them an anachronistic constitutional sensibility that simply cannot be sustained by the historical record. It is far more likely—indeed, it is the only plausible possibility—that Deady and the Oregon legislature knew exactly what they were doing in 1864 when they re-enacted the territorial obscenity statute. And what they were doing was enacting a statute that was entirely consistent with their understanding of Article I, section 8. Thus, I conclude that, based on the historical record concerning the period from the late eighteenth to the mid-nineteenth century, the regulation of the distribution of obscene materials to children was "well established" and that the framers of the Oregon Constitution did not understand that the power of the state to continue that regulation was abrogated by the adoption of Article I, section 8.

## C. *Whether ORS 167.065(1)(a) is "Wholly Contained" in the Historical Exception*

There remains the question whether the challenged statute is "wholly contained" within the historical exception. Within that broader question there also lurks a more narrow, but no less important one, concerning the impact of prior Supreme Court decisions regarding the extent to which there exists a historical exception for distributing obscene materials to children. The Supreme Court's decisions in *Henry* and *Stoneman*, in particular, require careful analysis, for in those cases the court rejected the contention that there was a historical exception for obscenity generally. In a nutshell, I conclude that ORS 167.065(1) is wholly contained within the historical exception that I have described and that nothing in any of the reported decisions to date precludes that conclusion. In fact, I suggest that the very reasons that the court has rejected historical exception arguments in other cases demonstrate why it is appropriate to recognize one in this case.

The 1853 territorial statute provided:

> "If any person shall import, print, publish, sell or distribute any book or any pamphlet, ballad, printed paper or other thing containing obscene language or obscene prints, pictures, figures, or other descriptions, manifestly tending to the corruption of the morals of youth, or shall introduce into any family, school or place of education, or shall buy, procure, receive, or have in his possession, any such book, pamphlet, ballad, printed paper or other thing, either for the purpose of sale, exhibition or circulation, or with the intent to introduce the same into any family, school, or place of education, he shall, on conviction, be punished by imprisonment in the county jail not more than six nor less than three months, or by a fine not more than three hundred, nor less than fifty dollars."

The focus of the statute is on the distribution of "obscene" materials to children. Indeed, the statute broadly prohibits introducing such materials to families, schools, or places of education if they "manifestly tend[ ] to the corruption of the morals of youth."

Like the territorial statute, the focus of ORS 167.065(1)(a) is the distribution of "obscene" materials to children. It is, if anything, narrower in focus than the territorial statute. Where the territorial statute broadly prohibited furnishing any "obscene" materials, ORS 167.065(1)(a) specifically defines "obscene" materials as depictions of "sadomasochistic abuse, sexual conduct or sexual excitement." And where the territorial statute broadly prohibits introducing obscene materials to children under any circumstances—into "any family, school or place of education"—ORS 167.065(1)(a) expressly excepts furnishing such materials by parents or by educators for an educational purpose or by other individuals who display prohibited material as an incidental part of an otherwise nonoffending whole for a legitimate purpose other than titillation. ORS 167.085. Thus, what ORS 167.065(1)(a) prohibits is completely contained by the prohibition described in the territorial statute.

That ORS 167.065(1)(a) is wholly contained within the territorial statute is convenient to the analysis. But it is not necessary. A historical exception does not consist of a single statutory prototype, but of a well-established principle of law *shown* by, among other things, one or more statutes. Thus, in *Robertson*, the Supreme Court did not say that a particular fraud or perjury statute constituted a historical exception, but rather that "some forms" of fraud or perjury could constitute historical exceptions and that the legislature has "some leeway" to extend the principles exemplified by such historical forms. According to *Robertson*, interpretation of Article I, section 8, "locks neither the powers of lawmakers nor the guarantees of civil liberties into their exact historic forms in the 18th and 19th centuries, as long as the extension remains true to the initial principle." *Robertson*, 293 Or at 434.

In this case, the "initial principle" that is illustrated by the 1853 territorial statute is the authority of the state to regulate the distribution of obscene material to children. Even assuming for the sake of the argument that ORS 167.065(1)(a) does not fit exactly within the language of the 1853 territorial statute, therefore, the modern statute nevertheless fits squarely and completely within the historical exception that it illustrates.

The foregoing point is critical to a proper understanding of the precedential impact of the Supreme Court's decisions in *Henry* and *Stoneman*. In *Henry*, the state argued that the 1853 territorial statute constituted a historical exception for the regulation of obscenity generally. The court rejected the argument. The court began by observing that, by itself, a statute is not necessarily sufficient to establish a historical exception: "[T]he constitutional guarantee of free speech and press will not be overcome by the mere showing of some legal restraints on one or another form of speech or writing." *Henry*, 302 Or at 521. The court emphasized that the regulation of speech must have been sufficiently well established that the court can safely conclude "that the guarantees of freedom of expression were not intended to replace the earlier restrictions." *Id*. The court further observed that a review of late eighteenth and early nineteenth-century history showed little in the way of a well-established tradition of state regulation. The state's burden, the court held, would be difficult, indeed.

The court then noted that the territorial statute, in any event, did not suffice, for two reasons. First, the court observed that the territorial statute contained no definition of "obscene." Second, the court observed that the statute "was directed primarily to the protection of youth." *Id*. at 522. Indeed, more than once, the court emphasized that the fact that the territorial statute was enacted "only to protect the morals of youth in this state" led it to conclude that "no broad or all-encompassing historical exception from the guarantees of free expression was ever intended." *Id*. at 523.

The court's decision in *Henry* thus was a narrow one. It rejected the state's argument that there was a well-established historical exception for the regulation of obscenity generally. Whether the court was correct in that regard certainly is debatable, particularly in light of the foregoing historical record of early nineteenth-century regulation of obscenity, which the court simply did not acknowledge. But the correctness of *Henry* is beside the point. What is important is the fact that *Henry* in no way forecloses us from now recognizing a narrower historical exception for the regulation of the distribution of obscene materials to children, as opposed to recognizing a historical exception for the regulation of obscenity

generally. In *Henry* itself, the court cautioned that "[w]e do not hold that this form of expression [obscenity], like others, may not be regulated in the interests of unwilling viewers, captive audiences, minors and beleaguered neighbors. No such issue is before us." *Henry*, 302 Or at 525.

That *Henry* was not intended to be read broadly to foreclose the regulation of the distribution of obscene materials to children is borne out by the Supreme Court's decision in *Stoneman*. In that case, once again, the state argued that the 1853 territorial statute constituted a historical exception, this time for the regulation of child pornography, ORS 163.680 (1987). We had rejected the state's argument for several reasons. We began, echoing *Henry*, by holding that the territorial statute, by itself, could not establish a historical exception. *State v. Stoneman*, 132 Or App 137, 146-47, 888 P2d 39 (1994). In *dictum* we held that, in any event, even assuming that the statute represents a historical exception, the challenged child pornography statute was not wholly contained within it, for three reasons. First, we noted that the territorial statute prohibited the *distribution* of obscene materials to children, while ORS 163.680 (1987) prohibited the *purchase and possession* of such materials. *Stoneman*, 132 Or at 147. Second, we noted that the territorial statute "appears to have been directed solely at protecting youths from *viewing* obscene materials, not from being the subjects of such materials," as ORS 163.680 (1987) prohibits. *Id.* (emphasis in original). Third, we noted that, because the territorial statute did not delineate the boundaries of what was considered "obscene," it could not be determined whether the modern statue was wholly contained within the historical one. *Id.*

The Supreme Court agreed with our historical exception analysis:

"We agree with the Court of Appeals majority that, without more, that territorial statute did not sufficiently and clearly establish an historical exception within which the statute under review in the present case could be said 'wholly' to fall."

*Stoneman*, 323 Or at 545. The court did not go farther than that, however. As in *Henry*, the court limited its holding in

*Stoneman*; it did no more than reject the state's argument that the territorial statute, by itself, constitutes a historical exception. In fact, the court noted that "[n]othing in this opinion, however, should be construed to reflect on the continuing vitality of the implication in *Henry* that the protection of children may constitute an historical exception when assessing the scope of Article I, section 8 * * *." *Id.* at 543 n 7 (citation omitted).

*Henry* and *Stoneman* thus do not preclude us from concluding that, based not merely on the existence of the 1853 territorial statute, but on that *and* the historical context in which it was enacted, there is a historical exception for the protection of children from the distribution of obscene materials. Indeed, both *Henry* and *Stoneman* expressly contemplate that possibility. The courts simply have not been confronted with the issue to date. With this case, we now are.

One issue remains, however. Both in *Henry* and in *Stoneman*, the court expressed concern with the fact that, although the territorial statute prohibited the distribution of obscene materials to minors, it did not define what it meant by "obscene." *Henry*, 302 Or at 522; *Stoneman*, 323 Or at 545. The court observed that, without a historical definition of the term, it is difficult to determine the extent to which a modern statute falls wholly within a historical one prohibiting the distribution of "obscene" materials.

My response is in two parts. First, I note that the court did not say that the lack of a definition of obscenity was fatal to the historical exception argument. Otherwise, the court would not have gone on, at some length, to evaluate the other reasons for rejecting the statute in those cases and to caution that it did not consider foreclosed the argument that there might be a historical exception for protecting children from such materials.

Second, I note that, although the lack of a precise historical definition of "obscene" may render it "difficult" to determine in some cases whether a modern statute is wholly contained within a historical one, the fact remains it is not impossible to do so. It bears emphasis that *Robertson* does

not require that we ascertain the outer boundaries of a proposed historical exception, only that, whatever those boundaries may be, the modern statute under challenge falls wholly within it. In this case, the modern statute defines "obscene" fairly narrowly to include only materials depicting "sadomasochistic abuse, sexual conduct or sexual excitement." ORS 167.065(1)(a). Thus, as long as it can be shown that prohibiting the distribution of materials depicting "sadomasochistic abuse, sexual conduct or sexual excitement" to children was considered the legitimate subject of state regulation of obscenity at the time of the adoption of Article I, section 8, what *also* may have been considered obscene is irrelevant. As I have shown, that is not a difficult task. The relevant nineteenth-century case law makes clear that, whatever else "obscenity" may have included, it certainly included depictions of nudity and sex.

I conclude therefore that there is no impediment to holding that ORS 167.065(1)(a) is wholly contained within a historical exception to Article I, section 8. The statute prohibits furnishing obscene material—depicting sadomasochistic abuse, sexual conduct, and sexual excitement—to children. Common law and early nineteenth-century statutes prohibited at least that, whatever else they may have prohibited.

D. *The Lead Opinion's Critique*[12]

Although the lead opinion regards my historical exception analysis as unnecessary, it indulges in a thorough and thoughtful critique, which warrants at least a few brief responses. Its first and principal objection to the merits of my historical exception analysis is that it is inconsistent with what the Supreme Court held in *Henry*. According to the lead opinion, *Henry's* holding is a sweeping condemnation of the idea that there can be any historical exception related to the regulation of obscenity. It ignores what the court itself said in *Henry* about the scope of its holding, however. In particular, it declines to acknowledge the court's *caveat* that "[w]e do not hold that this form of expression [obscenity], like others, may be regulated in the interests of unwilling viewers, captive

---

[12] Judge Haselton does not join in this portion of Judge Brewer's opinion. It thus commands less than a majority on the point, and I refer to it as the "lead opinion."

audiences, minors and beleaguered neighbors. *No such issue is before us." Henry,* 302 Or at 525 (emphasis added). Moreover, it ignores the fact that, in *Stoneman* itself, the court reiterated that same *caveat,* namely, that nothing in its decision should be read to "reflect on the continuing vitality of the implication in *Henry* that the protection of children may constitute an historical exception when assessing the scope of Article I, section 8 * * *." *Stoneman,* 323 Or at 543 n 7. My opinion attempts to address the issue that the court in *Henry* and in *Stoneman* expressly said has not yet been addressed. The lead opinion simply is wrong in suggesting that *Henry* forecloses the historical exception analysis in which I engage.[13]

The lead opinion next complains that, on the merits, my historical exception analysis merely rehashes the same historical record that the Supreme Court examined in *Henry.* There certainly is substantial overlap in the historical materials that I have cited, particularly those relating to the law before 1790; I make no pretense to having unearthed any startling new historical discoveries.[14] But the fact remains that, by its own terms, the Supreme Court limited its historical analysis both in time and scope. I have not merely rehashed the court's analysis. I have examined some of the

---

[13] Judge Armstrong makes the same point, albeit couched in terms more righteously indignant. He suggests that the Supreme Court's decision in *Henry* forecloses the conclusion that there exists a well-established historical exception for the protection of children from obscene materials and that I have ignored my obligation to follow Supreme Court precedent in suggesting otherwise. 168 Or App at 155 n 4 (Armstrong, J., concurring). With respect, it is Judge Armstrong who ignores the Supreme Court's express qualifications of its own holding in *Henry.* I have done no more than attempt to answer the question that the court made clear was left open in both *Henry* and *Stoneman.*

Judge Armstrong also makes an argument that the lead opinion does not, namely, that my historical exception analysis is foreclosed by the fact that obscene libel is not a "conventional" crime. According to Judge Armstrong, it is my task merely to apply the distinction between conventional and other crimes, "not to explain why it is untenable." 168 Or App at 156 n 5 (Armstrong, J., concurring). Judge Armstrong's argument, of course, amounts to mere question-begging. The very issue is what the court meant by its reference to "conventional" crimes and its relationship to the *Robertson* historical analysis. I have, in good faith, attempted to articulate an answer to those questions, not to assert that what the court has said is in any way "untenable." Judge Armstrong's concerns are misplaced.

[14] Much of what I have described, for example, has been reported previously in Alschuler, *Origins of the Law of Obscenity* at 65-79; Schauer, *The Law of Obscenity* at 10-15; and Barnhart, *The Oregon Bill of Rights and Obscenity* at 935-40.

historical evidence that the court mentioned in *Henry*—and a lot more—with a view to answering an entirely different question from the one that the court answered in that case.

The lead opinion then focuses its critical attention on my analysis of the question whether, by enacting Article I, section 8, the people intended to abrogate the established authority of the state to regulate the distribution of obscene materials to children. It complains that, by expressing the question in that fashion, I have impermissibly shifted the burden from the state to establish the constitutionality of ORS 167.065(1)(a). 168 Or App at 146. The point is academic, in my view. Regardless of who has the burden, the fact remains that there is evidence that the framers believed that the authority of the state to regulate the distribution of obscene materials to children survived the enactment of Article I, section 8, and there is no evidence to the contrary.[15]

The lead opinion also complains that the evidence that I have cited, principally the reenactment of the territorial obscenity statute *after* the adoption of the constitution, is insufficient and that the sort of "statute counting exercise" in which I have engaged is not what is required in conducting proper historical exceptions analysis. 168 Or App at 142. Of course, the sort of "statute counting exercise" about which it complains is precisely what the Supreme Court does in its own cases. *Moyle* and *Henry* exemplify the point. Aside from that, I challenge the lead opinion to explain how it is that courts can answer questions as to the nature of nineteenth-century law without referring to nineteenth-century law.

Finally, and in a related vein, the lead opinion expresses concern that the sort of historical analysis in which I have engaged simply cannot be an appropriate way to determine the scope and meaning of Article I, section 8, because it

---

[15] To the extent that the lead opinion correctly characterizes the burden, though, there is thereby created an interesting conflict with the long-established principle that legislative action always is supported by a strong presumption of constitutionality. *See, e.g., Greist v. Phillips*, 322 Or 281, 298, 906 P2d 789 (1995) (quoting *Duke Power Co. v. Carolina Env. Study Group*, 438 US 59, 83-84, 98 S Ct 2620, 57 L Ed 2d 595 (1978)); *State ex rel Juv. Dept. v. Orosco*, 129 Or App 148, 150, 878 P2d 432 (1994), *rev den* 326 Or 58 (1997). Why statutes challenged under Article I, section 8, should be treated differently from those challenged under any other provision of the Oregon Constitution in that regard is difficult to understand.

would "emblazon nineteenth-century thinking on twentieth-century challenges." 168 Or App at 144-45. I share those misgivings. After having engaged in this project of archeological jurisprudence, I, too, must confess to some lingering discomfort. Although my examination of the historical record leaves no doubt in my mind that the framers would have understood that the regulation of obscenity was a legitimate prerogative of state government, I am troubled by the underlying assumption that we should be constrained in our interpretation of the constitution by the understandings of its framers, that is, that we are bound by the understandings of framers who lived in a completely different historical milieu and possessed completely different ideas about the nature of government and its relation to its citizens.[16] It bears recalling in that regard that many of the framers of the constitution believed that individuals of color could be owned as property, that women could not participate in governmental affairs, that only individuals of wealth could exercise the franchise, and that segregation in education was appropriate.[17] More to the matter at hand, as Lawrence Friedman observed, "[w]hat passed for obscene or pornographic [in the nineteenth century] was a far cry from what would pass as such today. Works were banned that would not bring a blush to the cheek of the most delicate plant in our times." Lawrence M. Friedman, *Crime and Punishment in American History* at 350. That such nineteenth-century literary sensibilities should govern constitutional rights in the twenty-first strikes me as odd, indeed.

Having said that, however, the exercise in which I have engaged clearly is required by *Robertson* and its progeny. And any concern that I or others may harbor as to the

---

[16] Criticism of originalism as an interpretive approach has been the subject of sustained and withering criticism in scholarly journals for several decades. *See, e.g.*, Michael J. Klarman, *Antifidelity*, 70 S Cal L Rev 381 (1997); Mark V. Tushnet, *Following the Rules Laid Down: A Critique of Interpretivism and Neutral Principles*, 96 Harv L Rev 781 (1983); Paul Brest, *The Misconceived Quest for the Original Understanding*, 60 BU L Rev 204 (1980). *But see* Keith E. Whittington, *Constitutional Interpretation: Textual Meaning, Original Intent and Judicial Review* (1999) (proposing various responses to critique of originalism on philosophical and hermeneutic grounds).

[17] In 1849, for example, the Oregon Territorial Legislature enacted a law that prevented "any negro or mulatto to come into or reside within the limits of this Territory." Laws of Oregon 1850, p 181, § 1.

propriety of the exercise must await the Supreme Court's re-examination of its own case law. Perhaps this case will present an opportunity for the court to do just that. In the meantime, I am persuaded that what I have described is correct within the framework that the court has prescribed.

The effect of concluding that a statute wholly falls within a historical exception, as the Supreme Court held in *Stoneman*, is the removal of "any state constitutional bar to [the] statute that is directed at the content of speech." *Stoneman*, 323 Or at 543 n 7. It is, in other words, unnecessary to engage in the overbreadth analysis that the lead opinion conducts. ORS 167.065(1)(a) falls entirely within a historical exception to the constraints of Article I, section 8. Therefore, at least as to that provision of the Oregon Constitution, the statute is entirely constitutional.

## IV. OTHER ISSUES

Defendant argues that, even if the statute does not violate the state constitution, it does violate the First Amendment to the United States Constitution. According to defendant, the statute is unconstitutionally overbroad. The state first argues that defendant failed to raise that argument below and thus cannot raise it for the first time on appeal. I agree with the state.

At trial, defendant's sole argument was that, as a consequence of our earlier decisions in *Frink* and *House*, ORS 167.065(1)(a) already had been declared unconstitutional in its entirety. I have examined the briefs and the oral argument below, and I can find no assertion that, apart from those two Court of Appeals decisions, there is a basis for concluding that the statute is unconstitutionally overbroad. I would not entertain such an argument now.

Even assuming that the argument has been preserved, it still is unavailing. Defendant's federal constitutional argument consists of a quote from *Erznoznik v. City of Jacksonville*, 422 US 205, 95 S Ct 2268, 45 L Ed 2d 125 (1975). In that case, the United States Supreme Court struck down a statute that prohibited the showing at a drive-in theater of any movie containing nudity. The Court held that the statute swept too broadly because, among other things, it

was not limited to sexually explicit nudity. The case has no bearing on the constitutionality of ORS 167.065(1)(a). As this court already held, the effect of *Frink* and *House* was to sever the reference to "nudity" in the statute; it no longer prohibits providing pictures of mere nudity to children.

Closer to the mark is *Ginsberg v. New York*, 390 US 629, 88 S Ct 1274, 20 L Ed 2d 195 (1968). At issue in that case was the constitutionality of a New York criminal obscenity statute, that prohibited the sale to minors of depictions of "nudity, sexual conduct, or sadomasochistic abuse and which is harmful to minors." The statute defined "harmful to minors" in a way that was broader than what would have been considered "obscene" for adult viewers. The defendant challenged the authority of the state to prohibit the sale of materials to minors that would not have been obscene to adults. The Court held that the state has an interest " 'to protect the welfare of its children,' and to see that they are 'safeguarded from abuses' which might prevent their 'growth into free and independent well-developed' " citizens. *Id.* at 640-41 (quoting *Prince v. Massachusetts*, 321 US 158, 165, 64 S Ct 438, 88 L Ed 645 (1944)). To sustain the power of the state to prohibit the distribution of certain material to children that is considered harmful "requires only that we be able to say that it was not irrational for the legislature to find that exposure to material condemned by the statute is harmful to minors." *Ginsberg*, 390 US at 641. The Court then concluded that it was not irrational for the legislature to conclude that exposure to "nudity, sexual conduct or sadomasochistic abuse" would be harmful to children. *Id.* at 643.

This case is not materially different from *Ginsberg*. ORS 167.065(1)(a), in fact, is virtually identical to the statute at issue in *Ginsberg* in all material respects. In my view, the United States Supreme Court's decision is controlling. Whatever we may think about the wisdom of restricting the availability of such materials to children, the fact is that it is not irrational for the Oregon legislature to conclude that furnishing depictions of "sadomasochistic abuse, sexual conduct or sexual excitement" to children would be harmful to them. As a result, I have no trouble concluding that the statute passes federal constitutional muster.

In short, I would hold that ORS 167.065(1)(a) does not violate Article I, section 8, of the Oregon Constitution. It is wholly contained within a historical exception to the protections of that constitutional provision. I would not reach the federal question that defendant raises for the first time on appeal. But, even if that issue were properly before us, I would readily conclude that the statute does not offend the free expression guarantees of the federal constitution either.

I respectfully dissent.

Edmonds, J., joins in this dissent.